## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| CITY OF WARWICK MUNICIPAL EMPLOYEES PENSION FUND, Individually and on Behalf of All Others Similarly Situated, | : : : | Case No. |
| | : | CLASS ACTION |
| Plaintiff, | : : | |
| vs. | : : | COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| RACKSPACE HOSTING, INC., WILLIAM TAYLOR RHODES, and KARL PICHLER, | : : : | DEMAND FOR JURY TRIAL |
| Defendants. | : : : | |

Plaintiff City of Warwick Municipal Employees Pension Fund ("Warwick" or "Plaintiff"), individually and on behalf of all others similarly situated, alleges the following based on personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based upon the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by Rackspace Hosting, Inc. ("Rackspace" or the "Company"), as well as conference call transcripts and media and analyst reports about the Company.   Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all investors who purchased or otherwise acquired Rackspace common stock between November 11, 2014 and August 10, 2015, inclusive (the "Class Period").   The action is brought against Rackspace and certain of the Company's senior executives (collectively, "Defendants") for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder.

2.      Defendant Rackspace, together with its subsidiaries, is a cloud computing company that provides data hosting and other related services to business customers around the world.   The Company's cloud computing services offer public, private, and hybrid cloud hosting, that include dedicated servers, databases, storage, and networking.

3.      Rackspace has two reportable segments: the Americas and International.   The International segment accounted for 32 percent of Rackspace's 2015 revenue.   Vodafone Group Plc ("Vodafone"), a U.K.-based multinational telecommunications provider, was a significant customer within the Company's International segment.   According to Chief Executive Officer ("CEO") William Taylor Rhodes, Vodafone is one of Rackspace's "largest and longest-tenured customers."

4.       In 2007, Vodafone launched M-Pesa (M for mobile, pesa is Swahili for money), a mobile phone-based money transfer, financing and microfinancing service.  M-PESA allows users to deposit, withdraw, transfer money and pay for goods and services easily with a mobile device.  M-PESA spread rapidly, and by 2010 had become the most successful mobile-phone-based financial service in the developing world.

5.       On August 9, 2010, the Company's then-CEO, Lanham Napier, highlighted that Rackspace had renewed the so-called M-PESA contract with Vodafone for an additional five years (the "Vodafone Contract").   After this renewal, the Vodafone Contract was due to expire in five years, or on April 1, 2015.

6.       By the start of the Class Period, unbeknownst to investors, Rackspace and Vodafone were in discussions concerning the non-renewal of the Vodafone Contract.  In fact, Vodafone had engaged in extensive data-migration away from Rackspace servers well in advance of the April 1, 2015 expiration date, signaling Vodafone's intent to replace the Rackspace contract with alternative providers.

7.       While investors could have speculated that the Vodafone Contract would terminate on the April 1, 2015 expiration date, Defendants intentionally concealed the impending loss of the Vodafone Contract, and the attendant impact on the Company's growth prospects.   Indeed, Defendants never disclosed the financial impact of the Vodafone Contract non-renewal on Rackspace's reported financial results and future growth.  As detailed herein, the Vodafone Contract was highly material to Rackspace's business – Vodafone was one of Rackspace's "largest and longest-tenured customers," and a significant contributor to Rackspace's International segment, which represented 32 percent of the Company's 2015 revenues.

8.     Because Defendants concealed the impending loss of the Vodafone Contract, and the concomitant impact on the Company's business outlook and financial prospects, Rackspace common stock traded at artificially inflated prices during the Class Period, reaching a high of nearly $56 per share on April 27, 2015.

9.     Suddenly, on May 11, 2015, after months of touting the strength and growth prospects of its U.K. business, which would have included Vodafone, Rackspace reported its First Quarter ("Q1") 2015 Revenue and Margins and issued weak sales outlook.  The Company primarily attributed this disappointing news to a "one-time revenue headwind" due to the expiration of a contract from one of the Company's "largest and longest-tenured customers."

10.     On the same day, during the Company's earnings call, CEO Rhodes further stated that "the reason we decided to mention [the expiration of the contract] -- and we've never done before -- is it is material, and it is significant."  Still, Rhodes attempted to ease investor concern by reiterating the Company's full-year 2015 guidance of $2.0 to $2.1 billion, and stating that Rackspace retains "a healthy relationship with [Vodafone], and expect[s] to grow this revenue back with them over time."

11.     In response to this announcement, the price of Rackspace shares stock declined over the next two trading days – falling from  $53.13 per share on May 11, 2015 to close at $43.75 per share on May 13, 2015, or 17.65 percent, on extremely heavy trading volume.

12.     Then, on May 27, 2015, during the Cowen and Company 43rd Annual Technology, Media & Telecom conference call, analysts expressed concern about the Company's knowledge of the Vodafone Contract expiration and its impact on full-year 2015 revenue guidance.   The Company's Chief Financial Officer ("CFO"), Karl Pichler, responded by stating that Vodafone is "one of our largest customers in the Company and the largest one in our UK business . . . . [s]o in this specific case, we have been [sic] known about this. We have been talking about this."

Remarkably, during the conference call, Rackspace acknowledged that its 2015 revenue guidance of $2.0 to $2.1 billion remained unchanged.

13.     In reaction to this news, Rackspace stock dropped $0.78 per share, or 1.83 percent, to close at $41.86 per share on May 28, 2015.

14.     Finally, on August 10, 2015, the true impact of the Vodafone Contract non-renewal was finally revealed when Rackspace lowered its 2015 revenue guidance to "just below $1.99 billion" due to "marketing and sales issues . . . and product challenges." Although the Company did not attribute this guidance reduction to the Vodafone Contract non-renewal specifically, the loss of Q3 and Q4 2015 Vodafone Contract recurring revenues that were originally assumed during these quarters caused the Company to lower its 2015 revenue guidance.

15.     On this news, Rackspace stock dropped $2.49 per share, or 7.85 percent, to close at $29.24 per share on August 11, 2015.

## JURISDICTION AND VENUE

16.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

17.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b) as Defendants conduct business in this District, and a significant portion of the Defendant's actions, and the subsequent damages, took place within this District.   In addition, Rackspace's stock traded on the New York Stock Exchange ("NYSE"), located within this District.

18.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

19.     Plaintiff Warwick, as set forth in the accompanying Certification, which is incorporated by reference herein, purchased Rackspace common stock during the Class Period and has been damaged thereby.

20.     Defendant Rackspace, together with its subsidiaries, provides data hosting and other related services to business customers around the world.  The Company's common stock traded on the NYSE under the ticker symbol "RAX" during the Class Period.  On November 3, 2016, the Company was acquired by funds affiliated with the private equity firm Apollo Global Management and is no longer listed for trading.

21.     Defendant William Taylor Rhodes ("Rhodes") is, and was throughout the Class Period, the Chief Executive Officer, President, and a member of the Rackspace Board of Directors.

22.     Defendant Karl Pichler ("Pichler") is, and was throughout the Class Period, a Senior Vice President, Chief Financial Officer, and Treasurer of Rackspace.

23.     Defendants Rhodes and Pichler are referred to herein as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Rackspace's reports to the SEC, press releases, and presentations to securities analysts, money portfolio managers and institutional investors, *i.e.*, the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein, as those

statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

24.     Rackspace and the Individual Defendants are referred to herein, collectively, as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

25.     Defendant Rackspace provides hybrid cloud-based services that enable businesses to run their workload in a public or private cloud.   The Company offers hosting plans which include server configuration and deployment, scalable bandwidth options, server maintenance, and installation and support for select operating systems and Internet-based applications.

26.     The Company has two reportable segments: the Americas and International.   The Americas segment accounted for 68 percent of Rackspace's 2015 revenues.   The International segment accounted for 32 percent of Rackspace's 2015 revenues.   Vodafone Group Plc, a U.K.-based multinational telecommunications provider, was a significant customer within the Company's International segment.   According to CEO Rhodes, Vodafone is one of Rackspace's "largest and longest-tenured customers."[1]

27.     Vodafone has a 40% stake and management responsibility for Safaricom, Ltd. ("Safaricom"), a leading mobile network operator in Kenya.   In 2007, Vodafone launched M-Pesa (M for mobile, pesa is Swahili for money), a mobile phone-based money transfer, financing and microfinancing service.

28.     M-PESA allows users to deposit, withdraw, transfer money and pay for goods and services easily with a mobile device.   M-PESA is a valuable service in emerging economies where

---

[1]     *See Q1 2015 Rackspace Hosting, Inc. Earnings Call*, Thomson Reuters, May 11, 2015.

there is little or no existing banking infrastructure outside the major cities.  Users are charged a small fee for sending and withdrawing money using the service.  M-PESA spread rapidly, and by 2010 had become the most successful mobile-phone-based financial service in the developing world.[2]  Over the past decade, M-PESA's user base has rapidly grown to tens of millions of mobile phone users. According to Vodafone's website, M-Pesa is available in the following countries: Kenya, Tanzania, Mozambique, Lesotho, Democratic Republic of the Congo, Egypt, India, Romania and Albania.[3]

### Rackspace Announces Multi-Year Contract Renewal With Vodafone

29.     On August 9, 2010, during Rackspace's Q2 2010 earnings call, the Company's then-CEO Lanham Napier highlighted that the Company had renewed the so-called M-PESA contract with Vodafone for an additional five years, stating, in pertinent part, as follows:

> Vodafone in the UK renewed with Rackspace for an additional five-year contractor host its industry-leading mobile phone financial services application, M-PESA. M-PESA is now the most popular money transfer and payment system in Kenya, revolutionizing the way its users can send and receive money.

> *       *       *

> We are happy about the renewal with Vodafone over in the UK. So we continue to feel very bullish on our Enterprise opportunity.

30.     On September 29, 2010, the Company repeated its announcement that it had been chosen by Vodafone to host and support the M-PESA platform.  The Company's then-Managing Director stated that "[w]e're excited to be working with Vodafone on this project and look forward to seeing how it develops across the world to support those people who currently do not have access to banks and in turn help them to become more economically active through the application of

---

[2]     Jack, William; Suri, Tavneet (August 2010). "The Economics of M-PESA" (PDF). MIT. http://www.mit.edu/~tavneet/M-PESA.pdf

[3]     http://www.vodafone.com/content/index/what/m-pesa.html.

innovative technology."   After this renewal, the Vodafone Contract was due to expire in five years, or on April 1, 2015.

31.     By the start of the Class Period, unbeknownst to investors, Rackspace and Vodafone were in discussions concerning the Vodafone Contract non-renewal.  In fact, Vodafone had engaged in extensive data-migration away from Rackspace servers well in advance of the April 1, 2015 expiration date, signaling Vodafone's intent to replace the Rackspace contract with alternative providers.

### MATERIALLY FALSE AND MISLEADING
### STATEMENTS ISSUED DURING THE CLASS PERIOD

32.     The Class Period starts on November 11, 2014.  On November 10, 2014, after the close of trading and just four and one-half months before the Vodafone Contract was set to expire, Rackspace issued a press release announcing its financial results for Q3 2014, for the period ended September 30, 2014.  The Q3 2014 press release announced positive third quarter sales and made confident statements about the Company's sales growth and product demand.   For example, Defendant Rhodes commented on the results stating, in pertinent part, as follows:

> We are . . . encouraged by the momentum we are seeing in the business . . .
>
> *     *     *
>
> We are poised to capitalize on the massive opportunity ahead in the managed cloud market, where we see increasing demand for our managed services and expertise.

33.     On the same day, the Company held a conference call with analysts and investors to discuss the Company's earnings release and financial results from operations.  During the conference call, Defendant Pichler stated the following concerning the Company's growth, in pertinent part:

> First, strong growth results. Our constant currency growth rate of 4.4% was the highest in almost two years.  We saw good growth across our product, had traction with new customers as well as our installed base, 2nd we are winning deals of considerable size consistently.  Our managed cloud strategy is clearly resonating with customers and industry analysts, and we are well positioned to build on our success.

Defendant Rhodes also stated the following regarding the Company's positive outlook:

I think for now what we wanted to do was show that we have mastery of our business model, and be able to drive capacity over a lot of the investment we made last year. As we've told you very consistently, we added the data center capacity, the new product capacity; and that this year, we would have the chance to grow the revenue over that capacity and get our utilization up. We feel good about our progress so far, and we'll update you on how we think 2015 looks. But again, we're committed to both revenue growth and end margin.

34.     The statements referenced above in ¶¶ 32-33 were materially false and misleading as they failed to disclose and misrepresented the following adverse facts which were known to Defendants or recklessly disregarded by them as follows:

(a)     Vodafone had initiated extensive data migration away from Rackspace servers, signaling Vodafone's intent to replace Rackspace in the Vodafone Contract with alternative providers on the contract's April 1, 2015 expiration date;

(b)     the failure to secure a renewal of the Vodafone Contract would have a significant near-term financial impact on the Company's 2015 recurring revenues; and

(c)     as a result of the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company and its growth prospects.

35.     On December 2, 2014, during the Credit Suisse Annual Tecnology Conference, Defendant Rhodes continued to emphasize growth in the Company's international business segment, stating "[o]ur international business today is again about . . . 30% of our business overall.  It's growing nicely.  It's predominantly a U.K. and EMEA business."

36.     On February 17, 2015, Rackspace issued a press release announcing its financial results for Q4 2014, for the period ended December 31, 2014.  On the same day, the Company held a conference call with analysts and investors to discuss the Company's earnings release and financial

results from operations.   During the conference call, Defendant Rhodes stated the following

concerning the Company's growth, in pertinent part:

> Our fourth-quarter results represent another quarter of strong growth and improving
> margins for Rackspace. We believe that the progress and momentum that we built in
> the quarter and throughout 2014, demonstrates the success of our strategy and our
> position as the world's number one managed cloud company. . . .

37.   Defendant Rhodes also provided the following responses to an analyst who had

inquired about Rackspace's U.K. business:

> <Q – **Jonathan Atkin – RBC Capital Markets LLC**>: And then, just last question,
> just the UK business, it is a significant portion and perhaps a little bit more enterprise
> focused. I'm just wondering how that compares with sort of core U.S. business in
> terms of size of contract, churn characteristics, verticals, anything qualitatively that
> makes that different versus similar to the US? Thanks.

> <A – **Taylor Rhodes – President, Chief Executive Officer and Member of the
> Board of Directors**>: Sure. Yes. Our UK business is a great business.  It has very
> low churn rates,[4] a little bit better than Rackspace overall, but not significantly better.
> Because of the proximity to London, we do tend to have more interaction with what
> we would call enterprise customers there in terms of the overall mix.

> Since launching the public cloud into the UK market, we actually have found a great
> diversification of our business out into Continental Europe, because cloud customers
> do business in English and they can access the cloud in the self-service model, so
> that's been a good market opener for us out of the UK. So, ultimately it's a great
> business. It's growing well and we feel like we do very, very well as the market
> leader there in terms of brand.

38.   In reaction to Defendant Rhodes' statements about growth and low churn rates, Bank

of America analyst Scott Shiao reiterated a buy recommendation on Rackspace stock noting that

2014 revenue growth showed "continued momentum" through the year and that first quarter 2015

forecasts appeared "conservative" as fourth quarter churn remained strong.

---

[4]      "Churn" is a metric that gives investors the rate at which customers are renewing their
contracts.   Prior to and during the Class Period, Rackspace published Company-wide monthly
average churn rates in its quarterly and annual filings.   Churn is therefore used by analysts and
investors to extrapolate future sales.   Strong churn implies "low" churn because churn is the rate at
which customers do not renew their existing contracts.

39.     The statements referenced above in ¶¶ 35-37 were materially false and misleading for the reasons stated above in ¶ 34.

40.     On March 2, 2015, Rackspace filed its 2014 annual report on Form 10-K with the SEC for the period ending December 31, 2014, which was signed by Defendants Rhodes and Pichler.  The Form 10-K did not disclose that Vodafone had made a decision to migrate data away from Rackspace servers, signaling Vodafone's intent to replace the Rackspace Contract with alternative providers, and that a failure to renew the Vodafone Contract would have a significant near-term financial impact on the Company.

41.     Under the rules and regulations governing the preparation of the Form 10-K, Rackspace was required to make disclosures required by Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303.  Item 303(a) requires an issuer to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on the sales or revenues or income from continuing operations."  Given the financial contributions of the Vodafone Contract, Vodafone's decision to accelerate non-renewal via data migration from Rackspace servers created a known uncertainty that the Company reasonably expected to have "a material favorable or unfavorable impact on the sales or revenues or income from continuing operations" and was, therefore, required to be disclosed in the Form 10-K.

42.     Then, on May 11, 2015, after months of touting the strength and growth prospects of its U.K. business, Rackspace reported its 1Q 2015 financial results from operations, including revenue and margin performance which missed analyst forecasts.  The Company primarily attributed this disappointing news to a "one-time revenue headwind" due to the expiration of a contract from one of the Company's "largest and longest-tenured customers."

43.     On the same day, during the Company's Q1 2015 conference call to discuss the Company's earnings release and financial results from operations, Defendant Pichler and Rhodes provided the following response to an analyst who had inquired about the Company's Q2 churn impact:

> <Q – **Simon Flannery – Morgan Stanley & Co. LLC**>: Thanks very much. Karl, would it be possible to size the Q2 churn impact, just so we get a sense of how much we're dealing with here? And then Taylor, you made some comments, earlier in your remarks, just about the competitive landscape. And I think you sort of talked about some of the challenges some of your competitors have. Can you just update us on that? Where you stack up versus some of the Telcos, and some of the sort of legacy IT companies? And how you're doing in the RFPs, et cetera, pricing trends?
>
> <A – **Karl Pichler – Senior Vice President, Chief Financial Officer & Treasurer**>: Yes, we're not going to specifically articulate what that single customer event is, in terms of percentage contribution, but it's not insignificant.
>
> <A – **Taylor Rhodes – President, Chief Executive Officer & Director**>: Yes, Simon**,** the reason we decided to mention it -- and we've never done before -- is it is material, and it is significant.

44.     Despite the aforementioned decline to recurring revenues, Defendant Rhodes attempted to ease investor concerns by reiterating its full-year 2015 financial guidance, stating that "[o]ur pipeline is building nicely and we expect that our sales activities will improve during the second quarter, and create higher revenue growth in the second half of the year." Defendant Rhodes also stated the following regarding the Company's relationship with Vodafone, in pertinent part:

> [Rackspace] retain[s] . . . a healthy relationship with [Vodafone] and expect[s] to grow this revenue back with them over time.

45.     In reaction to this event, several analysts reduced their price targets on Rackspace stock.  For example, Evercore ISI ("Evercore") cut its target price from $60 to $50 per share. Evercore analyst Jonathan Schildkraut noted that the customer creating this "extraordinary" churn event was likely Vodafone, which accounts for an estimated $1.8 million to $2.0 million in monthly

recurring revenue for the Company.  Morgan Stanley,  Cowen, and Crédit Lyonnais Securities Asia similarly  cut their price targets on Rackspace stock.

46.     In response to the loss of the Vodfone Contract, the price of Rackspace shares stock declined over the next two trading days – falling from  $53.13 per share on May 11, 2015 to close at $43.75 per share on May 13, 2015, or 17.65 percent, on extremely heavy trading volume. This two-day drop wiped out more than $1.3 billion of the Company's  market capitalization.

47.     Then, on May 27, 2015, a few days after Rackspace revealed the loss of the Vodafone Contract,  during the Cowen and Company 43rd Annual Technology, Media & Telecom conference call,  analysts  expressed  concerns  about: (1)  the  timing  of  the  Company's  knowledge  that  the Vodafone Contract would expire; and (2) the impact of the Vodafone Contract expiration on full-year 2015 revenue guidance.  In addition, during the conference call, Rackspace acknowledged that its 2015 revenue guidance of $2.0 to $2.1 billion had not changed.  In reaction to this call, Rackspace stock dropped $0.78 per share, or 1.83 percent, to close at $41.86 per share on May 28, 2015.

48.     On May 28, 2015, the following day, Cowen and Company published a note stating that it was "more negative" on Rackspace's ability to meet its 2015 forecasts.  Cowen's concerns about Rackspace related to the loss of the Vodafone Contract.  On this news, Rackspace common stock dropped an additional 4.23 percent.

49.     Finally, on August 10, 2015, the true impact of the Vodafone Contract nonrenewal was finally revealed when Rackspace lowered its 2015 revenue guidance to "just below $1.99 billion" due to "marketing and sales issues  . . .  and product challenges."  Although the Company did not specifically attribute this guidance reduction to the Vodafone Contract nonrenewal, the loss of Q3 and Q4 2015 Vodafone Contract recurring revenues that were originally assumed during these quarters caused the Company to lower its 2015 revenue guidance.  In reaction to lowered 2015

revenue guidance, Rackspace stock dropped $2.49 per share, or 7.85 percent, to close at $29.24 per share on August 11, 2015.

50.     The market for Rackspace common stock was open, well-developed and efficient at all relevant times.   As a result of these materially false and misleading statements and omissions as set forth above, Rackspace common stock traded at artificially inflated prices during the Class Period.   Plaintiff and other members of the Class purchased or otherwise acquired Rackspace common stock relying upon the integrity of the market price of Rackspace common stock and market information relating to Rackspace, and have been damaged thereby.

51.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Rackspace common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.   Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

52.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause, of the damages sustained by Plaintiff and other members of the Class.   As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Rackspace's business, prospects, and operations.   These material misstatements and omissions had the cause and effect of creating, in the market, an unrealistically positive assessment of Rackspace and its business, prospects, and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.   Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class

purchasing Rackspace common stock at artificially inflated prices, thus causing the damages complained of herein.   When the true facts about the Company were revealed to the market, the inflation in the price of Rackspace common stock was removed and the price of Rackspace common stock declined dramatically, causing losses to Plaintiff and the other members of the Class.

## ADDITIONAL SCIENTER ALLEGATIONS

53.     As alleged herein, Rackspace and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.   As set forth elsewhere herein in detail, these Defendants, by virtue of their receipt of information reflecting the true facts regarding Rackspace, their control over, and/or receipt and/or modification of Rackspace's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Rackspace, participated in the fraudulent scheme alleged herein.

## NO SAFE HARBOR

54.     The "Safe Harbor" warnings accompanying Rackspace' reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.   To the extent that projected revenues and earnings were included in the Company's financial reports prepared in accordance with GAAP, including those filed with the SEC on Form 8-K, they are excluded from the protection of the statutory Safe Harbor.   *See* 15 U.S.C. §78u-5(b)(2)(A).

55.     Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was

authorized and/or approved by an executive officer of Rackspace who knew that the FLS was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## APPLICATION OF PRESUMPTION OF RELIANCE:
## FRAUD ON THE MARKET

56.     Plaintiff will rely upon the presumption of reliance established by the fraud on the market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     the omissions and misrepresentations were material;

(c)     Rackspace common stock traded in an efficient market;

(d)     the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of Rackspace common stock; and

(e)     Plaintiff and other members of the Class purchased Rackspace common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

57.     At all relevant times, the market for Rackspace common stock was efficient for the following reasons, among others:

(a)     as a regulated issuer, Rackspace filed periodic public reports with the SEC; and

(b)      Rackspace regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

## LOSS CAUSATION/ECONOMIC LOSS

58.      During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Rackspace common stock and operated as a fraud or deceit on Class Period purchasers of Rackspace common stock by misrepresenting the value of the Company's business and prospects as detailed herein.   As Defendants' misrepresentations and fraudulent conduct became apparent to the market, the price of Rackspace common stock fell precipitously, as the prior artificial inflation came out of the price.   As a result of their purchases of Rackspace common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

59.      Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all persons or entities who purchased or otherwise acquired Rackspace common stock during the Class Period (the "Class").   Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

60.      The members of the Class are so numerous that joinder of all members is impracticable.   Throughout the Class Period, Rackspace common stock was actively traded on the NYSE.   While the exact number of Class members is unknown to Plaintiff at this time and can only

be ascertained through appropriate discovery, Plaintiff believes that there are hundreds of thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Rackspace and/or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

61.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

62.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

63.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the Exchange Act was violated by Defendants as alleged herein;

(b)     whether statements made by Defendants misrepresented material facts about the business, operations and management of Rackspace; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

64.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

<u>COUNT I</u>

**For Violations of §10(b) of the Exchange Act and Rule 10b-5**
**Against All Defendants**

65.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

66.     During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

67.     Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

        (a)     Employed devices, schemes, and artifices to defraud;

        (b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

        (c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Rackspace common stock during the Class Period.

68.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Rackspace common stock. Plaintiff and the Class would not have purchased Rackspace common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

69.     As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Rackspace common stock during the Class Period.

## COUNT II

### For Violations of §20(a) of the Exchange Act
### Against All Defendants

70.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

71.     The Individual Defendants acted as controlling persons of Rackspace within the meaning of Section 20(a) of the Exchange Act.   By virtue of their positions and their power to control public statements about Rackspace, the Individual Defendants had the power and ability to control the actions of Rackspace and its employees.   By reason of such conduct, Defendants are liable pursuant to Section 20(a) of the Exchange Act.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.     Awarding rescission or a rescissory measure of damages; and

E.     Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  May 10, 2017                              **LABATON SUCHAROW LLP**

_/s/ Christopher J. Keller_____
Christopher J. Keller
Eric J. Belfi
Francis P. McConville
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Emails: ckeller@labaton.com
         ebelfi@labaton.com
         fmcconville@labaton.com

_Attorneys for City of Warwick Municipal
Employees Pension Fund_

## CERTIFICATION

I, Alfred T. Marciano, as Chairman for City of Warwick Municipal Employees Pension Fund ("Warwick"), hereby certify as follows:

1.      I am fully authorized to enter into and execute this Certification on behalf of Warwick.  I have reviewed the complaint prepared against Rackspace Hosting, Inc. ("Rackspace"), alleging violations of the federal securities laws;

2.      Warwick did not purchase common stock of Rackspace at the direction of counsel or in order to participate in any private action under the federal securities laws;

3.      Warwick is willing to serve as a lead plaintiff and representative party in this matter, including providing testimony at deposition and trial, if necessary;

4.      Warwick's transactions in Rackspace common stock during the Class Period are reflected in Exhibit A, attached hereto;

5.      Warwick has not sought to serve as a lead plaintiff in any class action under the federal securities laws filed during the last three years;

6.      Beyond its pro rata share of any recovery, Warwick will not accept payment for serving as a lead plaintiff and representative party on behalf of the Class, except the reimbursement of such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this  10th  day of May, 2017.

Alfred T. Marciano
*Chairman*
*City of Warwick Municipal Employees Pension Fund*

EXHIBIT A

TRANSACTIONS IN RACKSPACE HOSTING INC.

| Transaction Type | Trade Date | Shares | Price Per Share | Cost / Proceeds |
|---|---|---|---|---|
| Purchase | 12/04/14 | 200.00 | $46.18 | ($9,235.54) |
| Purchase | 12/04/14 | 1,340.00 | $46.18 | ($61,880.13) |
| Purchase | 12/05/14 | 330.00 | $47.26 | ($15,594.98) |
| Purchase | 12/05/14 | 620.00 | $47.26 | ($29,300.70) |
| Purchase | 01/14/15 | 380.00 | $45.99 | ($17,476.20) |
| Purchase | 01/14/15 | 420.00 | $46.18 | ($19,396.82) |
| Purchase | 01/14/15 | 70.00 | $46.21 | ($3,234.47) |
| Sale | 04/09/15 | -190.00 | $51.10 | $9,708.62 |
| Sale | 05/12/15 | -1,010.00 | $46.02 | $46,475.66 |
| Sale | 05/19/15 | -200.00 | $43.00 | $8,600.76 |
| Sale | 05/19/15 | -230.00 | $42.93 | $9,873.67 |
| Sale | 05/19/15 | -1,730.00 | $42.98 | $74,348.13 |