# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CITY OF WARWICK MUNICIPAL EMPLOYEES PENSION FUND, Individually and on Behalf of All Others Similarly Situated, | Civil Action No.: 1:17-cv-03501-JFK |
| Plaintiff, | **CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |
| vs. | **JURY TRIAL DEMANDED** |
| RACKSPACE HOSTING, INC., WILLIAM TAYLOR RHODES, and KARL PICHLER, | |
| Defendants. | |

**MOTLEY RICE LLC**
William H. Narwold
20 Church St., 17th Floor
Hartford, CT 06103
Telephone: (860) 882-1681
Facsimile: (860) 882-1682
Email: bnarwold@motleyrice.com


James M. Hughes (*pro hac vice*)
William S. Norton
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450
Email: jhughes@motleyrice.com
        bnorton@motleyrice.com

*Lead Counsel for Lead Plaintiff
and the Class*

**LABATON SUCHAROW LLP**
Michael W. Stocker
Alfred L. Fatale III
Ross M. Kamhi
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: mstocker@labaton.com
        afatale@labaton.com
        rkamhi@labaton.com

*Liaison Counsel for Lead Plaintiff
and the Class*

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ............................................................................................. 2

II.  JURISDICTION AND VENUE ...................................................................... 4

III.  THE PARTIES ................................................................................................. 5

    A.  Lead Plaintiff ........................................................................................ 5

    B.  Defendants ............................................................................................ 5

IV.  FACTUAL ALLEGATIONS .......................................................................... 8

    A.  Background on Rackspace, Cloud Hosting, Vodafone, and M-Pesa ..................... 8

    B.  In 2010, Vodafone Renewed Its Contract
       with Rackspace to Host and Support M-Pesa ...................................... 12

    C.  M-Pesa Usage Grows Rapidly Following
       Rackspace's Contract Renewal with Vodafone ................................... 13

    D.  Beginning in 2013, Vodafone Initiates an Extensive
       Two-Year Data Migration Away from Rackspace .............................. 15

    E.  During the Class Period, Rackspace Touts the Company's
       "Momentum," "Good Growth," "Progress," and "Expansion,"
       While Failing to Disclosethat Vodafone Would Not, and Could
       Not, Renew the Vodafone Contract ..................................................... 16

    F.  In May 2015, Rackspace Provides Lower-than-Expected
       Second-Quarter 2015 Guidance Due to the Loss of the Vodafone
       Contract ............................................................................................... 19

    G.  Defendants Admit They Knew in Advance About the Loss of the
       Vodafone Contract, Admit that the Company's Full-Year 2015
       Guidance Did Not Account for the Loss of the Contract, but
       Reaffirm that Guidance ........................................................................ 23

    H.  The Truth Is Revealed When Rackspace
       Finally Lowers Its Full-Year 2016 Guidance ..................................... 25

    I.  A Former Rackspace Employee Confirms that Since 2014,
       Defendants Knew of M-Pesa's Service Disruptions and
       Vodafone's Plan to Migrate M-Pesa to Kenya and Not Renew Its
       Contract ............................................................................................... 25

J.       Lead Plaintiff's Industry Expert Explains
         that the Nature of M-Pesa's Data Migration
         Required Vodafone to Provide Rackspace at Least Six Months'
         Notice ......................................................................................................... 26

V.    DEFENDANTS' MATERIALLY FALSE AND
      MISLEADING STATEMENTS AND OMISSIONS ..................................................... 28

      A.       November 10, 2014 Press Release and Earnings Conference Call ...................... 28

      B.       November 10, 2014 Third Quarter 2014 Form 10-Q ........................................... 30

      C.       December 2, 2014 Credit Suisse Technology Conference ................................... 34

      D.       February 17, 2015 Press Release and Earnings Conference Call ........................ 34

      E.       March 2, 2015 Full-Year 2014 Form 10-K .......................................................... 38

      F.       March 3, 2015 JMP Securities Technology Conference ...................................... 39

      G.       March 4, 2015 Morgan Stanley Technology, Media & Telecom
               Conference ........................................................................................................ 40

      H.       March 11, 2015 Deutsche Bank Media, Internet & Telecom
               Conference ........................................................................................................ 41

      I.       May 11, 2015 Press Release and Earnings Conference Call ............................... 42

      J.       May 19, 2015 JPMorgan Global
               Technology, Media, and Telecom Conference .................................................... 45

      K.       May 27, 2015 Cowen Technology, Media & Telecom Conference .................... 46

VI.   ADDITIONAL ALLEGATIONS OF SCIENTER ............................................................. 49

VII.  LOSS CAUSATION ........................................................................................................ 53

VIII. PRESUMPTION OF RELIANCE .................................................................................... 54

IX.   INAPPLICABILITY OF THE STATUTORY SAFE
      HARBOR AND BESPEAKS CAUTION DOCTRINE ..................................................... 55

X.    CLASS ACTION ALLEGATIONS ................................................................................. 57

XI.   CAUSES OF ACTION .................................................................................................... 59

COUNT I
FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT
AND SEC RULE 10b-5 PROMULGATED THEREUNDER
(Against Defendant Rackspace and the Individual Defendants) ........................................ 59

COUNT II
FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT
(Against Defendants Rhodes and Pichler) ......................................................................... 62

XII.    PRAYER FOR RELIEF ................................................................................................. 64

XIII.   JURY TRIAL DEMANDED ......................................................................................... 64

Lead Plaintiff KBC Asset Management NV ("KBC"), by its undersigned attorneys, brings this action under Sections 10(b) and 20(a) of the U.S. Securities Exchange Act of 1934 (the "Exchange Act"), and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, on behalf of itself and all others similarly situated who purchased or otherwise acquired the publicly traded common stock of Rackspace Hosting, Inc. ("Rackspace" or the "Company") between November 11, 2014 and August 10, 2015, inclusive (the "Class Period").  Lead Plaintiff alleges the following upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters.  Lead Plaintiff's information and belief are based on, among other things, an independent investigation by Lead Plaintiff's Court-appointed counsel, which has included a review and analysis of:  (i) public filings by Rackspace with the SEC; (ii) interviews of numerous former employees of Rackspace; (iii) research reports by securities and financial analysts; (iv) economic analyses of securities movement and pricing data; (v) transcripts of investor calls with Rackspace senior management; (vi) publicly available legal proceedings; (vii) information provided by a consulting expert in cloud computing contracts; and (viii) other publicly available material and data identified herein.  Lead and Liaison Counsels' investigation into the factual allegations contained herein is continuing, and many of the facts supporting the allegations contained herein are known only to the Defendants (as defined herein) or are exclusively within their custody or control.  Lead Plaintiff believes that further substantial evidentiary support will exist for the allegations contained herein after a reasonable opportunity for discovery.

I.     **INTRODUCTION**

1.      Rackspace is a cloud computing company that provides its customers access to a network of remote servers on which customers store their data, rather than storing that data locally or in-house.

2.      During the Class Period, Rackspace focused specifically on the "managed cloud" segment of the cloud computing industry.  Managed cloud means that Rackspace not only stores its customers' data on a server, but also "manages" that data by running customers' applications on the server and providing related customer and technical support.  Rackspace focused on the managed cloud segment of this business as a way to differentiate itself from—and compete with—large, established players in the cloud computing industry, such as Amazon and Microsoft, who instead provided unmanaged cloud services.

3.      Rackspace employs a recurring-revenue business model, meaning that Rackspace generates revenue from customers that pay for Rackspace's services on a monthly basis.  As a result, Rackspace relied on a steady stream of predictable revenue and focused on growing its business through customer acquisition, customer retention, and the monetization of current customers to ensure recurring-revenue growth.

4.      For this reason, analysts and investors paid particularly close attention to the Company's sequential (i.e., quarter-to-quarter) growth as an indicator of how successfully the Company was acquiring, retaining, and monetizing customers, and thereby growing recurring revenues.  Relatedly, analysts and investors were also focused on Rackspace's "churn rate"—a metric that reflects the percentage of users of a service who discontinue using that service.  Significant churn events (such as losing a large contract) would have an impact on the Company's ability to grow recurring revenue.

2

5.     In August 2010, Rackspace announced that it had renewed a contract with the U.K.-based Vodafone Group Plc ("Vodafone")—one of the Company's largest customers (the "Vodafone Contract").  The Vodafone Contract, which was set to expire on April 1, 2015, provided that Rackspace would host the data associated with a mobile payment application in Kenya called M-Pesa.  M-Pesa is a mobile phone-based money transfer service that allows users to deposit, transfer, and withdraw money and pay for goods and services using their mobile phones.  Because Rackspace does not have a data center in Africa where most of M-Pesa's customers are based, the data was hosted in Germany.  As a result, transaction data on M-Pesa users' mobile phones were relayed from Africa to Germany and back to Africa via undersea fiber optic cables and satellites.

6.     As M-Pesa's user base began to grow substantially, the platform began to experience significant service delays and interruptions caused by power outages, damaged server discs, and damaged undersea fiber optic cables.  These service interruptions became so problematic that in 2013 Vodafone (specifically, Vodafone's subsidiary in Africa) began to migrate the M-Pesa infrastructure from Germany to a new cloud computing provider in Africa.

7.     Because Rackspace did not have a data center in Africa, the migration meant that Vodafone could not renew the Vodafone Contract with the Company, which would result in a significant churn event once the contract expired on April 1, 2015.  However, during the Class Period and before the Vodafone Contract expired, Defendants not only failed to disclose that Vodafone would not, and could not, renew the contract, but affirmatively reassured investors about the Company's recurring-revenue growth and that churn rates in the Company's U.K. business (where Vodafone is based) were low and stable.  In February 2015, Rackspace issued a

full-year 2015 financial guidance that, as Defendants later admitted, did not account for the loss of the Vodafone Contract's recurring revenue.

8.      Three months later, on May 11, 2015, Defendants revealed that the Vodafone Contract had not been renewed.  Defendants described the loss of one of Rackspace's "largest and longest-tenured customers" as a churn event that was "material" and "significant." Nevertheless, despite issuing a lower-than-expected second-quarter 2015 revenue guidance—due, in part, to the loss of the Vodafone Contract—Defendants continued to conceal the true financial impact of this "material" and "significant" churn event because Defendants reaffirmed the Company's full-year 2015 guidance.

9.      The full extent of Defendants fraud was revealed on August 10, 2015, when Rackspace finally lowered its full-year 2015 financial guidance, despite having reassured investors for months that the loss of the Vodafone Contract would not impact the Company's ability to meet the full-year guidance.  As a result of these disclosures, Lead Plaintiff and the Class suffered substantial losses on their investment in Rackspace common stock.

## II.      JURISDICTION AND VENUE

10.      The claims asserted herein arise pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

11.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

12.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  Many of the acts and transactions that constitute violations of law complained of herein, including the dissemination to the public of untrue statements of

material facts, occurred in this District.  In addition, Rackspace's common stock traded on the New York Stock Exchange ("NYSE"), located in this District.

13.     In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of a national securities exchange.

## III.   THE PARTIES

### A.     Lead Plaintiff

14.     On September 19, 2017, this Court appointed KBC to serve as Lead Plaintiff in this action pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA").  *See* ECF No. 28.

15.     KBC is a large institutional investment company based in Brussels, Belgium, that provides financial and investment services.  As part of KBC's asset management services, it is responsible for managing mutual funds, private funds, and institutional funds.  At the end of 2016, KBC had approximately €213 billion ($250 billion) of assets under management.  As set forth in the Certification already filed with the Court (ECF No. 20-1), during the Class Period, KBC's funds purchased shares of Rackspace's common stock and suffered damages as a result of the securities law violations alleged herein.

### B.     Defendants

16.     Defendant Rackspace, together with its subsidiaries, provides managed cloud data hosting and other related services to business customers around the world.  The Company's common stock traded on the NYSE under the ticker symbol "RAX" during the Class Period.  On November 3, 2016, the Company was acquired by funds affiliated with the private equity firm Apollo Global Management and is no longer publicly listed for trading.

17.     Defendant William Taylor Rhodes was, at all relevant times, the Company's Chief Executive Officer ("CEO"), President, and a member of the Rackspace Board of Directors. As CEO, Rhodes reviewed, approved, and signed Rackspace's false and misleading SEC filings. Rhodes also reviewed and approved Rackspace's false and misleading press releases and Forms 8-K during the Class Period.  Rhodes also participated in conference calls with securities analysts, during which Rackspace's false and misleading statements filed with the SEC and included in press releases were presented and discussed.

18.     Defendant Karl Pichler is, and was at all relevant times, the Company's Chief Financial Officer ("CFO"), Senior Vice President, and Treasurer.  As CFO, Pichler reviewed, approved, and signed Rackspace's false and misleading SEC filings.  Pichler also reviewed and approved Rackspace's false and misleading press releases and Forms 8-K during the Class Period.  Pichler also participated in conference calls with securities analysts, during which Rackspace's false and misleading statements filed with the SEC and included in press releases were presented and discussed.

19.     Defendants Rhodes and Pichler are collectively referred to as the "Individual Defendants" and, together with Rackspace, the "Defendants."

20.     Each of the Individual Defendants, by virtue of his high-level position with Rackspace, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels, and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition during his tenure with the Company, as alleged herein.  As set forth below, the materially misstated information conveyed to the public was the result of the collective actions of these individuals.  Each of these individuals, during his tenure with the

Company, was involved in drafting, producing, reviewing, and/or disseminating the statements at issue in this case, approved or ratified these statements, or was aware but recklessly disregarded that these statements were being issued regarding the Company.

21.     As executive officers of a publicly held company with common stock that was during the Class Period registered with the SEC pursuant to the Exchange Act, traded on the NYSE, and governed by the federal securities laws, the Individual Defendants each had a duty to disseminate prompt, accurate, and truthful information with respect to the Company's business, operations, financial statements, and internal controls, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded securities would be based on accurate information. The Individual Defendants each violated these requirements and obligations during the Class Period.

22.     The Individual Defendants, because of their positions of control and authority as executive officers of Rackspace, were able to and did control the content of the SEC filings, press releases, and other public statements issued with copies of the statements at issue in this action before they were issued to the public, and had the ability to prevent their issuance or cause them to be corrected. Accordingly, each of these individuals is responsible for the accuracy of the public statements detailed herein.

23.     The Individual Defendants, because of their positions of control and authority as executive officers of Rackspace, had access to adverse undisclosed information about the Company's business, operations, financial statements, and internal controls through access to internal corporate documents, conversations with other Rackspace officers, directors, and employees, attendance at Company management and Board of Directors meetings, and via reports and other information provided to them in connection therewith, and knew or recklessly

disregarded that these adverse undisclosed facts and material risks rendered the positive representations made by or about Rackspace false and misleading.

24.     The Individual Defendants are liable as participants in a fraudulent scheme or course of conduct that operated as a fraud or deceit on purchasers of Rackspace common stock by disseminating materially false and misleading statements and/or concealing adverse facts. The scheme:  (i) deceived the investing public regarding the Company's products, business, operations, and management, and the intrinsic value of Rackspace common stock; and (ii) caused Lead Plaintiff and members of the class to acquire Rackspace common stock at artificially inflated prices.

## IV.     FACTUAL ALLEGATIONS

### A.     Background on Rackspace, Cloud Hosting, Vodafone, and M-Pesa

25.     Rackspace, a managed cloud computing company, delivers computing, data storage, and applications to customers as a service over the Internet.

26.     Major players in the cloud computing market include large companies such as Amazon, Google, and Microsoft, which provide customers "unmanaged," commoditized cloud computing in which customers are given access to raw infrastructure (i.e., servers) and are expected to operate and manage the software applications that run on those servers.

27.     To differentiate itself and effectively compete with these large and deep-pocketed "unmanaged cloud"  companies, Rackspace focuses on the "managed cloud" segment of the industry.  Rackspace has described itself as the "No. 1 managed cloud specialist."[1]  Defendant Rhodes described "managed cloud" as follows:

> It's a service that allows businesses to tap the power of cloud computing without the pain of becoming an expert in everything.

---

[1] Taylor Rhodes, *What is Managed Cloud?*, Rackspace Blog (June 4, 2014)
https://blog.rackspace.com/what-is-managed-cloud.

> Companies that use managed cloud can focus on their core
> business — on building great applications and other new products,
> and landing new customers.  They can stay fast and lean, rather
> than having to swell their payroll with large teams of ops engineers
> and system administrators and other experts to manage IT that
> doesn't differentiate their company.[2]

28.     Thus, Rackspace provides its customers not only access to a server, but also runs and manages the applications on that server and provides related customer service and technical support.  According to the Company's website, Rackspace's "Fanatical Support®" customer service program offers "around-the-clock" service that the company describes as "results-obsessed customer service that's been part of our DNA since 1999."

29.     Rackspace has two reportable segments:  the Americas and International, which in 2015 respectively accounted for 68% and 32% of the Company's revenues.

30.     Rackspace employs a recurring-revenue business model, which means that the Company generates revenue from customers that pay a fixed amount for Rackspace's services on a monthly basis, similar to a subscription-based service.  The advantage of this business model is that it results in steady, predictable revenue on a consistent basis, but requires Rackspace to focus on customer acquisition, customer retention, and the monetization of current customers to ensure a steady stream of revenue.

31.     Rackspace's investors paid particularly close attention to the Company's sequential (i.e., quarter-to-quarter) revenue growth because this metric reflected Rackspace's ability to acquire, retain, and monetize customers that paid for Rackspace's services—that is, it reflected how well Rackspace was employing its recurring-revenue model.

32.     Rackspace's recurring-revenue model also meant that investors were particularly focused on churn rates in Rackspace's business—a metric Rackspace reported in its quarterly

---

[2] *Id.*

filings.  Churn rate is a non-GAAP metric that indicates the percentage of users of a service who discontinue using that service.  Because churn rate can be used by analysts and investors to analyze future recurring-revenue growth, Rackspace's churn rate was regularly discussed on the Company's earnings conference calls and by analysts covering the Company.

33.     For example, analysts at Credit Suisse issued a report on January 7, 2015 that discussed the Company's business model:  "While adding new customers will remain an important aspect of the business, small improvements in the net installed base contribution (more upgrades and/or less churn) will have a large impact on revenue growth given Rackspace's recurring revenue model."

34.     During the Class Period, Vodafone, a U.K.-based telecommunications company, was a significant customer within Rackspace's International segment, and one of the Company's three biggest customers overall.  Rackspace itself described Vodafone in May 2015 as one of its "***largest and longest-tenured customers***."[3]

35.     In 2007, Vodafone partnered with Safaricom, its partly owned subsidiary, to launch a mobile payment application in Kenya called M-Pesa.  The "M" in M-Pesa stands for mobile and "Pesa" is Swahili for money.  M-Pesa is a mobile phone application that enables the phone-based transfer of money.  M-Pesa allows users to deposit, transfer, and withdraw money, as well as pay for goods and services, via a mobile phone.

36.     Shortly after its introduction in Kenya, M-Pesa gained international acclaim.  On June 28th, 2007, *The Economist* published an article describing how M-Pesa facilitated financial transactions in Kenya:

> In Kenya, where bank branches are few and far between, M-PESA,
> a mobile-payment scheme run by Vodafone, a telecoms firm, and

---

[3] All emphasis added, unless otherwise noted.

Safaricom, a Kenyan operator, with the backing of the British government's Department for International Development, has created an alternative to banks.  Most M-PESA customers have no bank account, but they withdraw cash and make payments or send money using their mobile phones.  Their cash points are a network of airtime sellers dotted around the country—Safaricom shops, petrol stations, or any other shop used to handling cash.  Once they have verified a customer's identity via their telephone number, the agents will facilitate a transaction.  M-PESA keeps tabs on all the money and the float is held in a single account at the Commercial Bank of Africa in Nairobi.[4]

37.     In October 2008, *Forbes* predicted that M-Pesa would face challenges expanding in Africa, but acknowledged that "[M-Pesa] has seen subscribers increase from around 100,000 at its launch to more than 3.6 million by July 2008.  During that time, M-Pesa has moved some 21 billion Kenyan shillings ($288 million) around the country."[5]

38.     When M-Pesa launched in South Africa in August 2010, news outlet "MyBroadband" described how M-Pesa enabled financial transactions in South Africa:

In a statement Vodacom and Nedbank [a large South African bank] explained that the service works by loading money onto a Vodacom cellphone at any M-PESA outlet.  Outlets are retail stores, spazas, community service containers, and all Nedbank branches.  Customers can register for the service as well as deposit money into their M-PESA account at such outlets.  Money can also be withdrawn as cash.  Once you have money in your M-PESA account you can send it to any other cellphone in South Africa. The receiver can redeem the cash at an M-PESA outlet or Nedbank ATM.  If you're a Vodacom customer you may also choose to transfer the money to another person.  Only Vodacom customers can send M-PESA but anyone with a cellphone can receive it.  At launch M-PESA is offering basic money transfers but Nedbank and Vodacom say they are in the process of implementing additional services such as paying bills and buying goods.  In Kenya and Tanzania M-PESA has been extended to allow customers to pay for school fees, insurance premiums and to put money into savings accounts.  Customers there can also receive

---

[4] *Dial M for Money*, THE ECONOMIST (June 28, 2007).

[5] *Mobile Banks Face Challenges In Africa*, FORBES (Oct. 6, 2008).

payments such as salaries and dividends, according to Nedbank and Vodacom.[6]

**B.    In 2010, Vodafone Renewed Its Contract
with Rackspace to Host and Support M-Pesa**

39.    On August 9, 2010, Rackspace announced in an earnings call that Vodafone had "renewed with Rackspace for an additional five-year [contract to] host its industry-leading mobile phone financial services application, M-PESA," i.e., the "Vodafone Contract."

40.    Lanham Napier, then-President and CEO of Rackspace, discussed the Vodafone Contract:  "Stability of the hosted system is critical, as loss of data or delays in financial transactions are massively disruptive to the users who have come to rely on the system. Rackspace's ability to deliver Fanatical Support, security, massive scalability and true disaster recovery were key factors in winning the partnership with Vodafone."

41.    Also on August 9, 2010, Rackspace issued a Form 8-K announcing that "Vodafone, *our largest customer out of the UK region*, awarded Rackspace a five year contract."  Specifically, the Vodafone Contract was set to expire in five years on April 1, 2015.

42.    In an October 2, 2010 press release, Rackspace continued to tout the Vodafone Contract, explaining that the Company had been "chosen by Vodafone to host and support over 3 million daily transactions with the M-Pesa platform."

43.    Because Rackspace does not have a data center in Africa—where M-Pesa's customers are primarily based—Rackspace hosted the cloud platform in Germany.  As a result, transaction data on M-Pesa users' mobile phones was relayed to and from Rackspace's servers in Germany via undersea fiber optic cables and satellites.

---

[6] Rudolph Muller, *M-PESA Money Transfer Service Launched*, MYBROADBAND (Aug. 31, 2010).

### C.     M-Pesa Usage Grows Rapidly Following
###        Rackspace's Contract Renewal with Vodafone

44.     After Vodafone contracted with Rackspace to provide managed cloud hosting for

the M-Pesa platform, M-Pesa continued to grow in popularity, customers, and usage rates.  For

example, on November 2010, the BBC reported how "[o]ver 50%" of Kenya's "adult population

use the service":

> Mobile money transfer allows those without a bank account to
> transfer funds as quickly and easily as sending a text message.  The
> most successful of these systems, and the first to operate on a large
> scale, is M-Pesa. . . .  Over 50% of the adult population use the
> service to send money to far-flung relatives, to pay for shopping,
> utility bills, or even a night on the tiles and taxi ride home.[7]

45.     In 2015, *Forbes* reported that M-Pesa had become "so successful that traditional

banks have come to see it as a serious competitor."  The article described M-Pesa's "explosive

growth":

> Most people probably don't think of Kenya as an innovation and
> technology hub, but in 2007 it became the launching pad for M-
> Pesa, a transformative mobile phone-based platform for money
> transfer and financial services.  Since then, M-Pesa has undergone
> explosive growth:  in 2013, a staggering 43 percent of Kenya's
> GDP flowed through M-Pesa, with over 237 million person-to-
> person transactions.  M-Pesa is nearly ubiquitous in the daily lives
> of Kenyans due to a range of services that include money deposit
> and withdrawal, remittance delivery, bill payment, and microcredit
> provision.[8]

46.     A December 28, 2016 article by *Quartz Africa*[9] depicts the rapid growth of

"Kenya's M-Pesa" from 2010 to 2014:

---

[7] Fiona Graham, *M-PESA: Kenya's Mobile Wallet Revolution*, BBC NEWS (Nov. 22, 2010).

[8] Daniel Runde, *M-PESA and the Rise of the Global Mobile Money Market*, FORBES (Aug. 12, 2015).

[9] Joshua Masinde, *Kenya's M-Pesa platform is so successful regulators worry it could disrupt the economy*, QUARTZ AFRICA (Dec. 28, 2016).



47.     A "FY 2015 Presentation" by Safaricom depicts M-Pesa's growth in revenue and customers from 2012 through 2015:



### D.  Beginning in 2013, Vodafone Initiates an Extensive Two-Year Data Migration Away from Rackspace

48.     As M-Pesa began to significantly grow its customer base, the platform began experiencing service delays, interruptions, and outages.  Because Rackspace's cloud-hosting platform for M-Pesa was located in Germany, transactions had to be routed from Africa (where M-Pesa customers were primarily located) to Germany and then back to Africa.  This exposed

15

the system to delays and interruptions caused by power outages, damaged server discs, and damaged undersea fiber optic cables, and the need to reroute transmissions to satellites.

49.     Service disruptions and power outages on the servers in Germany became routine. These outages were particularly detrimental to M-Pesa users because they prevented M-Pesa customers from sending money, depositing and withdrawing money, paying bills, or conducting other transactions with their mobile phones.

50.     Because of these service disruptions and power outages, in 2013 Safaricom began to migrate the M-Pesa infrastructure from Germany to Kenya.  Hosting the platforms locally (i.e., in Kenya) would minimize service outages and lower related costs.

51.     Despite the extensive service disruptions and the data migration that followed, Defendants concealed from investors that the Vodafone Contract would not, and could not, be renewed as a result of the M-Pesa platform being transferred from Germany to Africa, where Rackspace did not have a data center.

**E.     During the Class Period, Rackspace Touts the Company's "Momentum," "Good Growth," "Progress," and "Expansion," While Failing to Disclose that Vodafone Would Not, and Could Not, Renew the Vodafone Contract**

52.     The Class Period begins on November 11, 2014, roughly four and one-half months before the Vodafone Contract was set to expire.  At that point, Defendants already knew that the Vodafone Contract would not, and could not, be renewed, and that this was a material and significant churn event that would have a substantial near-term financial impact on the Company's 2015 recurring revenues and growth.  Despite knowing this, Defendants intentionally concealed from investors the impending loss of the Vodafone Contract, and instead issued misleading reassurances and guidance regarding the Company's growth, customer retention, and churn rates in the Company's U.K. business (where Vodafone is based)—metrics that were particularly important to investors given Rackspace's recurring-revenue model.

16

53.     On November 10, 2014, Rackspace issued a press release announcing its financial results for the third quarter of 2014, which included a statement by Defendant Rhodes about the Company's positive results:  "We are . . . ***encouraged by the momentum we are seeing in the business*** . . . .  We are poised to capitalize on the massive opportunity ahead in the managed cloud market, where ***we see increasing demand*** for our managed services and expertise."

54.     That same day, Rackspace held a conference call with analysts and investors to discuss the announced results.  During the call, Defendants Rhodes and Pichler continued to tout the Company's growth and customer retention, claiming "***increasing demand***," "***good progress***," and "***gained traction with customers***."

55.     Analysts reacted positively to Defendants' reassurances, focusing on what their statements signaled about Rackspace's ability to grow recurring revenues.  For example, on November 10, 2014, analysts at Credit Suisse issued a report stating:  "We are encouraged by reacceleration in revenue growths in the last three quarters, which reinforces our [belief] that the execution continues to improve . . . ."  The same day, analysts at Morgan Stanley cited Rackspace's "recurring revenue" as one of the Company's "key value drivers" and explained that Rackspace's consistent churn rates provided a "steady base of revenues" for the Company.

56.     Similarly, on November 19, 2014, analysts at Barclays issued a report stating: "We believe the international arena remains a key area of growth for the company.  At present around 32% of Rackspace revenues come from non-US customers, with most of these international revenues originating in the U.K. . . .  The company continues to expand."

57.     On December 2, 2014, during the Credit Suisse Technology Conference, Defendant Rhodes again emphasized the Company's "growing" international business segment,

stating: "[o]ur international business today is, again about 30% or 27%, 30% of our business

overall.  It's growing nicely.  It's predominantly a UK and EMEA business."

58.     In the months that followed, Defendants continued to repeatedly highlight

Rackspace's increased demand, strong momentum, growth, and low churn rates in the U.K.

business, while concealing the underlying truth.  On February 17, 2015, for instance, Rackspace

issued a press release providing revenue and earnings guidance for the full year of 2015:

> **For the full year 2015, Rackspace expects revenue to grow
> between 14 percent and 18 percent on a constant currency basis**.
> Based on foreign currency movements to date, Rackspace
> anticipates a 200 basis point headwind to revenue growth for the
> full year of 2015, resulting in GAAP revenue in the range of $2.0
> billion to $2.1 billion.  The company expects adjusted EBITDA
> margins to be between 33 percent and 36 percent for the year.

59.     This full-year 2015 guidance, as Defendants later revealed on May 27, 2015, *see*

*infra* Sections IV.F-G., did not account for the churn associated with the loss of the Vodafone

Contract—a churn event Defendants themselves described as "material" and "significant"—

despite that Defendants knew at the time that the Vodafone Contract would not, and could not,

be renewed.

60.     On the February 17, 2015 conference call discussing the Company's full-year

2015 financial results, Defendant Rhodes explained that the results reflected "another quarter of

**strong growth** and improving margins for Rackspace" and "**continued [ ] international**

**expansion**."  Defendant Rhodes, on that same call, also touted the low churn rates in the

Company's U.K. business:  "Our UK business is a great business.  **It has very low churn rates**, a

little bit better than Rackspace overall . . . ."

61.     Analysts were reassured by these statements.  For example, analysts at Barclays,

in a report issued on February 18, 2015, highlighted the Company's low churn rates:  "The

company also saw its churn levels remain stable . . . which we believe points to the company's

ability to retain customers in a competitive pricing environment.  Muted churn levels also suggest that despite heightened competition from cloud service providers (e.g., Microsoft, Google, Amazon, etc.) [Rackspace] continues to hold its own."

62.     Defendant Rhodes continued to tout the Company's growth prospects at several industry conferences in March 2015.  On March 3, 2015, for instance, at the JMP Securities Technology Conference, Defendant Rhodes cited "expansion of our business market into enterprise where we are winning more and more large deals."  Similarly, the next day during the Morgan Stanley Technology, Media & Telecom Conference, Defendant Rhodes stated:  "We have about 30% of our revenue overseas and ***it's growing well.***  It used to be a predominately U.K.-based business.  Now it's diversified into the continent."

63.     Defendant Rhodes also continued to assure investors that the Company was on track to hit its full-year 2015 guidance, telling investors during the March 4, 2015 Morgan Stanley Technology, Media & Telecom Conference that "we feel good about our guidance for 2015 which is about steadily better revenue growth while we're having stable to improve margins."

**F.      In May 2015, Rackspace Provides Lower-than-Expected Second-Quarter 2015 Guidance Due to the Loss of the Vodafone Contract**

64.     On May 11, 2015—after months of touting the strong growth and low churn of the Rackspace's U.K. business, and reaffirming its full-year 2015 earnings guidance—the Company reported its first-quarter 2015 financial results from operations, including revenue and margin performance that missed analyst forecasts.

65.     On that same day, Rackspace provided revenue guidance for the second quarter of 2015:  "For the second quarter of 2015, Rackspace expects revenue to grow between ***1.5% and 2.5% on a constant currency basis*** and adjusted EBITDA margins to be between 32 percent and

34 percent." This guidance was below analysts' consensus estimates, which forecasted revenue growth of 4.2% for the second quarter.

66.     During a May 11, 2015 conference call to discuss the first-quarter 2015 results, Defendants primarily attributed the Company's weak second-quarter guidance to a "one-time revenue headwind" associated with one of the Company's "***largest and longest-tenured customers***" transferring its data to a location in Africa, where Rackspace does not have a data center—i.e., Defendants indirectly revealed that the Vodafone Contract had not been renewed. Although the Company did not say so on that call, analysts speculated that the large customer was Vodafone.

67.     Despite the loss of the Vodafone Contract, Defendant Rhodes attempted to assure investors that Rackspace "retain[s] . . . a healthy relationship with [Vodafone], and expect[s] to grow this revenue back with them over time."

68.     Analysts immediately focused on Rackspace's loss of one of its largest customers. During the May 11, 2015 conference call, Morgan Stanley analyst Simon Flannery asked Defendants Rhodes and Pichler if they could quantify the impact of this churn event.  In response, Defendant Pichler and Rhodes described it as "***material***" and "***significant***":

> **[Defendant Pichler]**:  Yes, we're not going to specifically articulate what that single customer event is, in terms of percentage contribution, but ***it's not insignificant***.

> **[Defendant Rhodes]**:  Yes, Simon, the reason we decided to mention it – and we've never done before – ***is it it is material, and it is significant***.

69.     Despite lowering the Company's second-quarter 2015 guidance, Defendants reiterated the Company's full-year 2015 guidance (which guided revenue growth of 14% and 18% on a constant currency basis), thereby assuring investors that the "***material***" and "***significant***" churn event—the loss of the Vodafone Contract—would not impact Rackspace's

ability to meet its full-year guidance.  Indeed, during the May 11, 2015 conference call,

Defendant Rhodes explained:

> Despite our slower start to the year, ***we are not making changes to
> our full-year guidance range for revenue growth*** and adjusted
> EBITDA margin.  ***Our pipeline is building nicely, and we expect
> that our sales activities will improve during the second quarter,
> and create higher revenue growth in the second half of the year***.

70.     Later on the call, analysts pressed Defendants Rhodes and Pichler on how the

Company expected to meet its full-year guidance despite the lower-than-expected second-quarter

2015 guidance and the associated loss of a contract with one of its largest customers.  Defendant

Rhodes assured investors that the Company would still be able to meet its full-year 2015

guidance:  "The confidence, for us, it comes from pipeline, frankly.  And it comes from the fact

that yes, we know we have signed a couple of these that will materialize in Q3, and drive

revenue."

71.     Following the Company's May 11, 2015 announcement of the lower-than-

expected second-quarter guidance and the associated loss of one of its largest customers, several

analysts lowered their price targets on Rackspace stock, including analysts at Morgan Stanley,

Cowen, and Crédit Lyonnais Securities Asia.

72.     Analysts at Evercore ISI ("Evercore"), in a May 12, 2015 report, also reduced

their price target, citing, among other things, an "***Extraordinary 2q Churn Event***."  The

Evercore report speculated that the large customer was Vodafone, and analyzed the quantitative

impact of the loss of the Vodafone contract on the Company's second-quarter 2015 guidance.

73.     Specifically, the Evercore report analyzed the percentage of the guidance shortfall

(i.e., the difference between the actual second-quarter 2015 guidance and Evercore's estimates)

attributable to the churn event, as opposed to the other explanation the Company provided for its

lower-than-expected guidance, which was slower-than-expected closing of certain large contracts.

74.     The Evercore report explained that Rackspace provided a second-quarter 2015 guidance for revenue growth of 1.5% and 2.5%—roughly 1.4% to 2.4% lower than the 3.9% growth that Evercore had estimated.  A 1.5% – 2.5% revenue growth guidance "implies a range of $487 – $492 [million]," as compared to Evercore's implied $496.5 million revenue estimate, which is approximately $7 million more than the mid-point of the $487 – $492 million range. Evercore calculated that Vodafone generates approximately $1.8 to $2.0 million of monthly recurring revenue for the Company, or approximately $5.7 million of revenue per quarter, representing approximately 85% of the second-quarter 2015 guidance shortfall, relative to Evercore's prior estimates.  Thus, according to this estimate, the vast majority of the Company's lower-than-expected second-quarter 2015 guidance was attributable to the revenue the Company no longer would receive from the Vodafone Contract.  Although Evercore updated this analysis months later, it still attributed a significant percentage of the lost revenues from the Vodafone Contract to the reason for the lower-than-expected second-quarter earnings guidance.

75.     In response to the loss of the Vodafone Contract, the price of Rackspace shares stock declined over the next two trading days, falling from $53.13 per share on May 11, 2015, to close at $43.75 per share on May 13, 2015, or ***17.65%***, on extraordinarily heavy trading volume. This two-day drop wiped out more than $1.3 billion of Rackspace shareholder value.

76.     However, despite issuing a disappointing second-quarter 2015 revenue guidance—due, in part, to the loss of the Vodafone Contract—Defendants continued to conceal the true financial impact of this "material" and "significant" churn event when Defendants reaffirmed the Company's full-year 2015 guidance.

**G.    Defendants Admit They Knew in Advance About the Loss of the Vodafone Contract, Admit that the Company's Full-Year 2015 Guidance Did Not Account for the Loss of the Contract, but Reaffirm that Guidance**

77.    On May 27, 2015, Defendant Pichler presented on behalf of Rackspace at the Cowen Technology, Media & Telecom Conference.

78.    During the conference, Defendant Pichler was asked when Rackspace knew Vodafone was migrating its servers and how this churn event was factored into the Company's full-year 2015 guidance.  In response, Defendant Pichler admitted that the Company knew in advance about the churn event:

> [**Analyst**]:  Can you tell us when you found out about that customer planning on migrating? And how was that – what you had originally assumed in your 2015 guidance, which you just provided on February 17?
>
> [**Defendant Pichler**]:  . . . .  So I would say that there is a long-standing debate back and forth and there were some churn events in the past, and there are definitely going to be churn events in the future, but in general, over the relationship – the period of the relationship this has been a net positive grower.
>
> ***So in this specific case we have been – known about this.  We have been talking about this.  These are agreements that are being finalized and that one has been finalized shortly before the specifics of the renewal of the contract has been finalized in late Q1.***

79.    Analysts pressed for more information, questioning whether the loss of the Vodafone Contract was factored into the full-year 2015 guidance that the Company provided in February 2015, considering that Rackspace knew in advance about this churn event:

> [**Analyst**]:  So you had your call on February 17.  It sounds like then you had – you finalized the churn situation shortly thereafter and then obviously happened on April 1.
>
> ***But based on what I read online, it seems like this had been planned for some time, this migration.  So I would assume that at least them churning – maybe it wasn't April 1, but them churning was assumed in guidance.  Is that a fair assumption?***

23

[**Defendant Pichler**]:  Yeah, specifically – the thing is that we have – if you think about the components of churn, there's defection churn and downgrade churn.  Defection churn is somewhere between 0.5% and 1%, fairly consistent on a monthly basis in our subscription business, and then we have downgrade-related churn that is somewhere around 1% roughly.  And so we don't explicitly use certain – other than when we know a very specific large event is going to occur at a specific time, the way that we plan is that this is normal run rate of the churn situation.

***So it's not really something that we plan out for the very far future, because in a lot of instances the churn situation gets delayed or accelerated or the timing is not clear.  So we don't really – we factor in a churn assumption and then the specific timing is what creates volatility around the outcome***.

80.     Thus, Defendant Pichler admitted that the loss of the Vodafone Contract was ***not*** factored into the Company's full-year 2015 revenue guidance.  Nevertheless, Defendant Pichler continued to reaffirm the full-year 2015 guidance.

81.     Defendant Pichler also discussed the Company's second-quarter 2015 guidance, explaining that the loss of the Vodafone contract had a more significant impact on the weak guidance than did the other identified factor (i.e., lower-than-expected closing of certain large contracts):  "The churn had certainly a bigger impact of the two, because of [sic] it was April 1 and ***it was quite significant***."

82.     After this conference, Rackspace stock dropped $0.78 per share, or 1.83%, to close at $41.86 per share on May 28, 2015.

83.     On May 28, 2015, the following day, Cowen and Company published a note stating that it was "more negative" on Rackspace's ability to meet its 2015 forecasts.  Cowen's concerns about Rackspace related to the loss of the Vodafone Contract.  On this news, Rackspace common stock dropped an additional 4.23%.

**H.     The Truth Is Revealed When Rackspace
Finally Lowers Its Full-Year 2016 Guidance**

84.     On August 10, 2015, Rackspace issued a press release announcing its results for

the second-quarter 2015, and lowered its full-year 2015 revenue guidance to a range of 12% to

14%, from 14% to 18%, despite having reassured investors for months that the loss of the

Vodafone Contract would not impact the Company's ability to meet its guidance.

85.     Although the Company did not specifically attribute this guidance revision to the

loss of the Vodafone Contract, the loss of third- and fourth-quarter 2015 Vodafone Contract

recurring revenues, which the Company admitted it did not initially factor into its guidance,

forced the Company to lower its 2015 revenue guidance.

86.     In reaction to lowered 2015 revenue guidance, Rackspace stock dropped $2.49

per share, or another **7.85%**, to close at $29.24 per share on August 11, 2015.

**I.     A Former Rackspace Employee Confirms that Since 2014,
Defendants Knew of M-Pesa's Service Disruptions and
Vodafone's Plan to Migrate M-Pesa to Kenya and Not Renew Its Contract**

87.     The service disruptions that M-Pesa was experiencing with Rackspace's servers

were significant and well-known by Defendants during the Class Period.

88.     Confidential Witness ("CW") 1 worked for Rackspace from July 2013 until

March 2015 in London as the Head of Sales.  CW1 stated that after CW1's first year at

Rackspace and beginning in mid-2014, CW1 learned that Vodafone was migrating its data off of

Rackspace's servers because it was planning to bring its data in-house.   CW1 explained that

Rackspace was contracted to store and manage customer transaction data from Africa for

Vodafone.  CW1 recalled that Vodafone was using Rackspace as a temporary measure until it

could manage this data internally.

89.     CW1 stated that it was known beginning in mid-to-late 2014 that Vodafone was not going to renew its contract with Rackspace in 2015.  There was an emphasis on finding new business to make up for the expected loss of revenue from the Vodafone account.  CW1 commented, "We knew this was happening, so the company had to find other business to compensate for Vodafone."  CW1 further explained that given the nature of Vodafone as a customer—a type of customer that Rackspace did not typically compete for—CW1 knew that the loss of the Vodafone Contract would have had a "material impact on the company's business."

**J.     Lead Plaintiff's Industry Expert Explains
         that the Nature of M-Pesa's Data Migration
         Required Vodafone to Provide Rackspace at Least Six Months' Notice**

90.     Lead Plaintiff consulted an expert in cloud hosting contracts ("Expert A").  Expert A has direct industry experience with information technology, including the cloud computing industry.  In particular, Expert A has over 35 years of experience drafting and negotiating the commercial terms of information technology agreements and software licenses, including outsourcing, managed services, and hosting agreements.  His experience includes drafting and negotiating the termination and transition provisions in such agreements.  Expert A's informed conclusions are summarized below.

91.     Expert A opined that, "at minimum," pursuant to what is typical of managed cloud hosting contract renewals, Rackspace would have had between six and nine months' notice that Vodafone would not renew the Vodafone Contract.  Expert A explained that both cloud hosting/managed service vendors and their customers need at least six months' notice that a contract will not be renewed because the data migration to the customer (or the customer's designee) must be analyzed to ensure, among other things, that the data is not corrupted or duplicated.  An integral part of that process is to allow adequate time to ensure that the two sets of data (stored on the old host and new host) run in parallel.

92.     Expert A also described vendor industry practice with respect to contract

renewals.  According to Expert A, when a vendor is aware of data service disruptions (such as

lags or down time) that may jeopardize the contract's renewal, the vendor's chief executives are

likely to engage in frequent and regular internal meeting and calls to discuss disruptions

involving major customers.  Because of the inherent complexity of managed cloud hosting

service contracts, a vendor's executive officers would typically seek information one year before

contract renewal/expiration relating to billing rates, usage rates, contract management, and any

other factors that may provide an early warning that the contract may not be renewed.  Expert A

explained that a vendor's executives seek this information to help project future revenue.

93.     Expert A also explained that during 2014 and 2015, as M-Pesa usage increased

significantly, it was highly unlikely that Vodafone and Safaricom would simply "pull the plug"

on the day of the contract expiration or give merely one month's notice.  Because of the

significance and integral nature of data hosting to Vodafone and Safaricom's business model,

Rackspace would have had actual or constructive notice at a minimum six-to-nine months before

the contract expiration.

94.     Expert A opined that because M-Pesa's data migration was a massive

undertaking, it would have required the participation of all parties to the contract and the cloud

hosting, including Rackspace.  According to Expert A, Rackspace employees were integral to

any transition of data from Rackspace to the new provider.

95.     Expert A also opined that an "instant" data migration is a practical and

technological impossibility.  Given the large volumes of M-Pesa data stored and managed by

Rackspace, "this would have been a gradual migration" that likely happened over the course of

several months.  Expert A described how "over one, two, three months," perhaps the vendor

migrates 10%, then a little more, until "at some point," the vendor reaches a "critical mass of people," and then, ultimately, 100% migration, followed by the previously described "parallel run" and "parallel testing."  This implies that Rackspace was privy to the data migration and loss of the contract long before the Company revealed the truth.

## V.  DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

96.     Throughout the Class Period, Defendants made a series of statements regarding Rackspace's present and projected growth, international business operations, and churn rates, and also issued quarterly and full-year financial guidance.  As detailed below, these statements were false and misleading when made because Defendants failed to disclose that the Vodafone Contract could not be renewed after the data had been migrated to Africa, and that this was a material and significant churn event that would have a substantial near-term financial impact on the Company's 2015 recurring revenues and growth.  Indeed, Defendant Rhodes admitted on May 11, 2015, the impact of the loss of the Vodafone contract was "material" and "significant." Moreover, even after Defendants revealed that the Vodafone Contract had not been renewed, they continued to conceal the extent of the fraud by reaffirming the Company's full-year 2015 guidance, despite knowing that the guidance was unachievable without the recurring revenue from the Vodafone Contract.

### A.  November 10, 2014 Press Release and Earnings Conference Call

97.     On November 10, 2014, Rackspace issued and filed with the SEC a press release announcing its third quarter 2014 financial results (the "November 10, 2014 Press Release") on Form 8-K, signed by Defendant Pichler.  In the November 10, 2014 Press Release, the Company reported net revenue or $460 million for the quarter, up 4.2% from the previous quarter and up 18.3% from the third quarter of 2013.

28

98.     Defendant Rhodes commented on the Company's positive results in the

November 10, 2014 Press Release, stating, in part:

> We are pleased with our operating performance this quarter and ***encouraged by the momentum we are seeing in the business***. . . . ***We are poised to capitalize on the massive opportunity ahead in the managed cloud market, where we see increasing demand for our managed services and expertise***.  And while we made strong progress this year, we're determined to continually improve our execution and seize our future.

99.     The Company also held an earnings conference call on November 10, 2014 to

discuss its third quarter 2014 financial results (the "November 10, 2014 Earnings Call").  Both

Defendant Rhodes and Defendant Pichler participated in the call.  During the call, Defendant

Rhodes touted the Company's growth:

> Third, we see improvement in our operating performance and trajectory that validates our strategy.  This trend demonstrates that we are executing well and that our positioning as the number one managed cloud Company has taken root.
>
> ***
>
> The opportunity we face in the managed cloud market is massive with increasing demand for our managed services and expertise. ***We've made good progress this year; our managed cloud positioning has gained traction with customers and industry experts***.  ***We have strong alignment around our strategy, and the distractions that we have to overcome earlier this year are now behind us***.

100.    Also on the November 10, 2014 Earnings Call, Defendant Pichler similarly

discussed the Company's growth in the context of Rackspace's third-quarter 2014 results:

> Let me start by summarizing the key takeaways for the third quarter 2014.  ***First, strong growth results.  Our constant currency growth rate of 4.4% was the highest in almost 2 years. We saw good growth across our product, had traction with new customers as well as our installed base, and we are winning deals of considerable size consistently***.  Our managed cloud strategy is clearly resonating with customers and industry analysts, and we are well positioned to build on our success.

29

101.    In response to an analyst's question during the November 10, 2014 Earnings Call about the Company's expectation for margin growth in the future, Defendant Rhodes stated:

> I think for now what we wanted to do was show that we have mastery of our business model and be able to drive capacity over a lot of the investment we made last year.  As we've told you very consistently, we added the data center capacity, the new product capacity and that this year, we would have the chance to grow the revenue over that capacity and get our utilization up.  *We feel good about our progress so far, and we'll update you on how we think 2015 looks.  But again, we're committed to both revenue growth and end margin*.

102.    Defendants' statements in the November 10, 2014 Press Release and on the November 10, 2014 Earnings Call about "momentum," "strong growth," and the Company's managed cloud positioning "gain[ing] traction" were materially false and misleading because Defendants failed to disclose that the Vodafone Contract could not be renewed after the data had been migrated to Africa, and that this was a material and significant churn event that would have a substantial near-term financial impact on the Company's 2015 recurring revenues and growth.

**B.      November 10, 2014 Third Quarter 2014 Form 10-Q**

103.    On November 10, 2014, Rackspace filed with the SEC its Form 10-Q, signed by Defendant Pichler, for the quarterly period ended September 30, 2014 (the "3Q14 Form 10-Q"), reporting its third-quarter 2014 financial results.  The 3Q14 Form 10-Q incorporated the financial results announced in the November 10, 2014 Press Release.

104.    The 3Q14 Form 10-Q identified a number of risk factors related to the Company's business.  One such factor discussed the risk that the Company's existing customers could reduce or terminate their contracts with Rackspace, and the impact this would have on Rackspace's business prospects:

> *Our existing customers could elect to reduce or terminate the services they purchase from us because we do not have long-term*

***contracts with our customers, which could adversely affect our operating results.***

***Customer contracts for our managed dedicated hosting services typically have initial terms of one to two years which, unless terminated, may be renewed or automatically extended on a month-to-month basis***.  Our customers have no obligation to renew their services after their initial contract periods expire on these contracts.  In addition, many of our other services and products, including most of our public cloud products and services, are generally provided on a month-to-month basis and do not have an extended initial term at all.  Our costs associated with maintaining revenue from existing customers are generally much lower than costs associated with generating revenue from new customers.  Therefore, a reduction in revenue from our existing customers, even if offset by an increase in revenue from new customers, could reduce our operating margins.  ***Any failure by us to continue to retain our existing customers could have a material adverse effect on our operating results***.

105.  Another risk disclosure concerned the Company's international operations:

We anticipate that, for the foreseeable future, a significant portion of our revenue will continue to be derived from sources outside of the U.S.  A key element of our growth strategy is to further expand our customer base internationally and successfully operate data centers in foreign markets.  We have limited experience operating in foreign jurisdictions other than the U.K. and Hong Kong ***and expect to continue to grow our international operations***.  Managing a global organization is difficult, time consuming, and expensive.  Our inexperience in operating our business globally increases the risk that international expansion efforts that we may undertake will not be successful.

106.  The 3Q14 Form 10-Q also included a risk disclosure related the impact that

service interruptions could have on the Company's business:

***Our physical infrastructure is concentrated in a few facilities, and any failure in our physical infrastructure or services could lead to significant costs and disruptions and could reduce our revenue, harm our business reputation and have a material adverse effect on our financial results.***

Our network, power supplies and data centers are subject to various points of failure.  Problems with our cooling equipment, generators, uninterruptible power supply (UPS), routers, switches,

or other equipment, whether or not within our control, could result
in service interruptions for our customers as well as equipment
damage.  Because our hosting services do not require geographic
proximity of our data centers to our customers, our infrastructure is
consolidated into a few large facilities.  While data backup services
and disaster recovery services are available as a part of our hosting
services offerings, the majority of our customers do not elect to
pay the additional fees required to have disaster recovery services
store their backup data offsite in a separate facility, which could
substantially mitigate the adverse effect to a customer from a
single data center failure.  Accordingly, any failure or downtime in
one of our data center facilities could affect a significant
percentage of our customers.  The total destruction or severe
impairment of any of our data center facilities could result in
significant downtime of our services and the loss of customer data.
***Since our ability to attract and retain customers depends on our
ability to provide customers with highly reliable service, even
minor interruptions in our service could harm our reputation.***
The services we provide are subject to failure resulting from
numerous factors, including . . .

***

We have experienced interruptions in service in the past due to
such things as power outages, power equipment failures, cooling
equipment failures, routing problems, security issues, hard drive
failures, database corruption, system failures, software failures,
and other computer failures.  While ***we have not experienced a
material increase in customer attrition following these events***, the
extent to which our reputation suffers is difficult to assess.  We
have taken and continue to take steps to improve our infrastructure
to prevent service interruptions, including upgrading our electrical
and mechanical infrastructure.  ***However, service interruptions
continue to be a significant risk for us and could materially
impact our business***.

107.    Defendants' statements in the 3Q14 Form 10-Q about customer retention,

international operation, and service interruptions were materially false and misleading because

Defendants failed to disclose that the Vodafone Contract could not be renewed after the data had

been migrated to Africa, and that this was a material and significant churn event that would have

a substantial near-term financial impact on the Company's 2015 recurring revenues and growth.

Indeed, Defendants failed to disclose that, at the time these statements were made, the Vodafone

32

Contract could not, and would not be renewed, and that the M-Pesa platform in Germany had been experiencing outages and service interruptions, which resulted in Vodafone migrating the M-Pesa infrastructure from Germany to Kenya.  In short, the risks Defendants disclosed had already materialized with one of Rackspace's largest customers, yet this fact was not timely disclosed.

108.     Defendants' omissions violated further disclosure requirements called for by Item 303 of Regulation S-K, 17 C.F.R. § 229.303 ("Item 303"), and Item 503 of Regulation S-K, 17 C.F.R. § 229.503 ("Item 503").  Specifically, (1) Item 303 required the Company to disclose events or uncertainties that were both presently known to management and reasonably likely to have material effects on the Company's financial condition or results of operations, and (2) Item 503 required the Company to include "a discussion of the most significant factors that make the [securities] speculative or risky."

109.     SEC interpretive guidance associated with Item 303 explains that:

> ***Events that have already occurred or are anticipated often give rise to known uncertainties***.  For example, a registrant may know that a material government contract is about to expire.  ***The registrant may be uncertain as to whether the contract will be renewed, but nevertheless would be able to assess facts relating to whether it will be renewed.***  More particularly, the registrant may know that a competitor has found a way to provide the same service or product at a price less than that charged by the registrant, or may have been advised by the government that the contract may not be renewed.  The registrant also would have factual information relevant to the financial impact of non-renewal upon the registrant.  ***In situations such as these, a registrant would have identified a known uncertainty reasonably likely to have material future effects on its financial condition or results of operations, and disclosure would be required***.

110.     Defendants' statements in the 3Q14 Form 10-Q violated Items 303 and 503 because Defendants failed to disclose that the Vodafone Contract could not be renewed after the data had been migrated to Africa, and that this was a material and significant churn event that

would have a substantial near-term financial impact on the Company's 2015 recurring revenues and growth.  Defendants thus also failed to disclose (1) material events and known uncertainties that were reasonably likely to have a material adverse effect on its results of operations in violation of the disclosure requirements set forth in Item 303, and (2) significant, then-existing (as opposed to potential) factors that made the securities more speculative or risky than the Company disclosed in violation of the disclosure requirements set forth in Item 503.

### C.    December 2, 2014 Credit Suisse Technology Conference

111.    On December 2, 2014, Defendant Rhodes presented on behalf of Rackspace at the Credit Suisse Technology Conference.  During the conference, Defendant Rhodes discussed growth in the Company's international business segment:

> ***Our international business today is, again about 30% or 27%, 30% of our business overall.  It's growing nicely.  It's predominantly a UK and EMEA business***.  Asia-Pac is small, but growing rapidly for us.  We've invested further our portfolio in our Hong Kong data center as well as our Sydney data center within the last 24 months.  And we'll continue to make targeted investments in Europe and Asia.

112.    Defendants' statements during the Credit Suisse Technology Conference regarding growth in the Company's U.K. business were materially false and misleading because Defendants failed to disclose that the Vodafone Contract could not be renewed after the data had been migrated to Africa, and that this was a material and significant churn event that would have a substantial near-term financial impact on the Company's 2015 recurring revenues and growth.

### D.    February 17, 2015 Press Release and Earnings Conference Call

113.    On February 17, 2015, Rackspace issued and filed with the SEC a press release announcing its fourth quarter 2014 financial results (the "February 17, 2015 Press Release") on Form 8-K, signed by Defendant Pichler.  In the February 17, 2015 Press Release, the Company reported net revenue of $472 million, up 15.8% from the fourth quarter of 2013.

34

114.    The Company also held an earnings conference call on February 17, 2015 to discuss its fourth quarter 2014 financial results (the "February 17, 2015 Earnings Call"). Defendants Rhodes and Pichler both participated in the February 17, 2015 Earnings Call.  During the call, Defendant Rhodes discussed how those results reflected "strong growth" and the "success" of the Company's strategy:

> *Our fourth-quarter results represent another quarter of strong growth and improving margins for Rackspace*.  We believe that the progress and momentum that we built in the quarter and throughout 2014, demonstrates the success of our strategy and our position as the world's number one managed cloud company.

115.    Defendant Rhodes also explained on the February 17, 2015 Earnings Call that the Company "*continued [its] international expansion*" during the fourth quarter 2014.

116.    Later on that same call, Defendant Rhodes answered an analyst's question about Rackspace's "UK business" by stating that its "low churn rates" were "better than Rackspace overall":

> [**Analyst**]: And then, just last question, just the UK business, it is a significant portion and perhaps a little bit more enterprise focused. I'm just wondering how that compares with sort of the core US business in terms of size of contract, churn characteristics, verticals, anything qualitatively that makes that different versus similar to the US?  Thanks.

> [**Defendant Rhodes**]:  Sure.  Yes.  *Our UK business is a great business.  It has very low churn rates, a little bit better than Rackspace overall*, but not significantly better.  Because of the proximity to London, we do tend to have more interaction with what we would call enterprise customers there in terms of the overall mix.

> Since launching the public cloud into the UK market, we actually have found a great diversification of our business out into Continental Europe, because cloud customers do business in English and they can access the cloud in the self-service model, so that's been a good market opener for us out of the UK.  So, ultimately it's a great business.  *It's growing well and we feel like*

> *we do very, very well as the market leader there in terms of*
> *brand*.

117.    Defendants' statements in the February 17, 2015 Press Release and on the

February 17, 2015 Earnings Call about its results and "strong growth," continued expansion in

the Company's international business, and "low churn rates" in the U.K. business were

materially false and misleading because Defendants failed to disclose that the Vodafone Contract

could not be renewed after the data had been migrated to Africa, and that this was a material and

significant churn event that would have a substantial near-term financial impact on the

Company's 2015 recurring revenues and growth.  Indeed, Defendants specifically touted the

Company's international "expansion" and the "very low churn rates" in its U.K. business, but

failed to disclose that they knew the Vodafone Contract would not, and could not, be renewed—

a churn event Defendants described as "material" and "significant."

118.    In the February 17, 2015 Press Release, Rackspace provided revenue and earnings

guidance for the full year of 2015:

> *For the full year 2015, Rackspace expects revenue to grow*
> *between 14 percent and 18 percent on a constant currency basis.*
> *Based on foreign currency movements to date, Rackspace*
> *anticipates a 200 basis point headwind to revenue growth for the*
> *full year of 2015, resulting in GAAP revenue in the range of $2.0*
> *billion to $2.1 billion.  The company expects adjusted EBITDA*
> *margins to be between 33 percent and 36 percent for the year*.

119.    During the February 17, 2015 Earnings Call, Defendant Rhodes provided details

on the assumptions underlying the guidance:

> [**Analyst**]: . . . And then, looking forward, I think some investors
> may be a little concerned looking at your guidance range, even on
> a constant currency basis, just more at that lower end of the range.
> Obviously there's a reason you put it there.  How realistic is that
> and would we see a corresponding upper end of the margin range if
> you actually come in, in that zip code?  Can you walk us through
> sort of your assumptions on the range of the guidance?

[**Defendant Rhodes**]: In terms of the guidance range, I'll start first and Karl might add some commentary . . . but it's early in the year. I am a CEO who is on my second call with you guys.  I inherited a large product set, sales and marketing engine, a Fanatical Support engine that there's lots of moving pieces and I want to continue to explore the opportunities and places where we need to make change and improvement happen.  So for us, we are continuing to kind of look at the market in a long sense.  I believe our job this year is to take the next step forward on consistent growth, and stable and improving margin.  ***And we are in the bottom of the first inning of this first strategy move for us and so at this point of the year we are giving you the guidance range that we think is most helpful in this point of the conversation, and we think it gives us room to do what we said we would do which is steady improvement on the revenue growth track as well as stable to improving margins***.

120.    Defendants' statements in the February 17, 2015 Press Release and on the February 17, 2015 Earnings Call regarding the Company's full-year 2015 revenue and earnings guidance were false and misleading because Defendants failed to disclose that the Vodafone Contract could not be renewed after the data had been migrated to Africa, and that this was a material and significant churn event that would have a substantial near-term financial impact on the Company's 2015 recurring revenues and growth.  Indeed, as Defendants later revealed on May 27, 2015, *see supra* Sections IV.F-G., the Company's full-year 2015 revenue guidance provided on February 17, 2015 did not account for the churn associated with the loss of the Vodafone Contract—a churn event Defendants themselves described as "material" and "significant"—despite that Defendants knew at the time that the Vodafone Contract would not, and could not, be renewed and that this would require the Company to ultimately lower its full-year 2015 guidance.

E.     **March 2, 2015 Full-Year 2014 Form 10-K**

121.    On March 2, 2015, Rackspace filed with the SEC its Form 10-K, signed by Defendants Rhodes and Pichler, for the fiscal year ended December 31, 2014 (the "2014 Form 10-K"), reporting its full-year 2014 financial results.

122.    Item 1A of the 2014 Form 10-K required Rackspace to "[s]et forth any material changes from risk factors as previously disclosed" by the Company pursuant to Item 503, which requires a "discussion of the most significant factors that make the [securities] speculative or risky."

123.    The 2014 Form 10-K included the same three risk factors detailed above in Section V.B.

124.    Defendants' statements discussed in ¶¶ 104-07 and replicated in the 3Q14 Form 10-Q were false and misleading because Defendants failed to disclose that the Vodafone Contract could not be renewed after the data had been migrated to Africa, and that this was a material and significant churn event that would have a substantial near-term financial impact on the Company's 2015 recurring revenues and growth.  Indeed, Defendants failed to disclose that, at the time these statements were made, the Vodafone Contract could not, and would not be renewed, and that the M-Pesa platform in Germany had been experiencing outages and service interruptions, which resulted in Vodafone migrating the M-Pesa infrastructure from Germany to Kenya.  In short, the risks Defendants disclosed had already materialized with one of Rackspace's largest customers, yet this fact was not timely disclosed.

125.    Defendants thus also failed to disclose (1) material events and known uncertainties that were reasonably likely to have a material adverse effect on its results of operations in violation of the disclosure requirements set forth in Item 303, and (2) significant,

then-existing (as opposed to potential) factors that made the securities more speculative or risky than the Company disclosed in violation of the disclosure requirements set forth in Item 503.

       **F.**    **March 3, 2015 JMP Securities Technology Conference**

    126.   On March 3, 2015, Defendant Rhodes presented on behalf of Rackspace at the JMP Securities Technology Conference.  During the conference, Defendant Rhodes touted the Company's "improving growth quarter over quarter" due to "winning more and more large deals" with customers:

> Finally, over the years, we have a proven business model, proven sustained growth, profit and shareholder value.  And we're back, we're back in our game, ***we're executing our model***.  ***You're seeing three quarters now of sequentially improving growth quarter over quarter***.  ***And importantly also, we are starting to see an expansion of our business market into enterprise where we are winning more and more large deals.***  As the large traditional competitors struggle with being dislocated by cloud, we are getting an opportunity to take on more and more of those very profitable larger deals.

>                          \*\*\*

> At one point we're a 50% grower, right.  I think for us aspirationally we want to get back within the next couple of years to being a 20% plus growth company with good margins.  And our mission on this is also profitable growth, right.  We are not trying to suck out the profit of the Company, but we want to find those workloads.  If we're doing our job right, here's how you'll know it, one, we're selling where we don't get caught up in the conversation of the lowest price for a gigabyte of storage or compute; two, bigger deals which drive profit scale on our business and referencability.

> Those are the two sort of telltales, right.  If we are out shopping for the wrong kind of deals we aren't competing against Amazon, there again we are going to do stupid on profitable deals where it's all about infrastructure and we had no value on top.  So I think finding three or four of these big slices of the market, going deep vertically and becoming software referencing leader can get us back on a reasonable time frame to 20% plus growth.

127.    Defendants' statements during the JMP Securities Technology Conference about executing the Company's recurring-revenue growth model, "sequentially improving growth," and business expansion with large enterprise customers were materially false and misleading because Defendants failed to disclose that the Vodafone Contract could not be renewed after the data had been migrated to Africa, and that this was a material and significant churn event that would have a substantial near-term financial impact on the Company's 2015 recurring revenues and growth.

### G.    March 4, 2015 Morgan Stanley Technology, Media & Telecom Conference

128.    On March 4, 2015, Defendant Rhodes presented on behalf of Rackspace at the Morgan Stanley Technology, Media & Telecom Conference.  During the conference, Defendant Rhodes discussed the Company's international segment in response to a question from an analyst:

> [**Analyst**]:  You talked about international.  We've got some FX headwinds, but generally some good growth trends.  We heard earlier today you opened a new office in Mexico City.  So can you talk about the international opportunity?  It seems like most of your focus has been domestic.  But you've started to move overseas.
>
> [**Defendant Rhodes**]:  Yes.  ***We have about 30% of our revenue overseas and it's growing well***.  It used to be a predominately UK-based business.  Now it's diversified into the continent.  We've launched our offers in Asia Pacific.

129.    Defendant Rhodes also touted the Company's churn rates, which he described as "***remarkably stable***."

130.    In response to a question from an analyst about the Company's full-year 2015 guidance, Defendant Rhodes stated:  "***we feel good about our guidance for 2015, which is about steadily better revenue growth while we're having stable to improve margin***."

131.    Defendants' statements during the Morgan Stanley Technology, Media & Telecom Conference about the Company's international business, churn rates, and full-year 2015 guidance were materially false and misleading because Defendants failed to disclose that the Vodafone Contract could not be renewed after the data had been migrated to Africa, and that this was a material and significant churn event that would have a substantial near-term financial impact on the Company's 2015 recurring revenues and growth.  Indeed, as Defendants later revealed on May 27, 2015, *see supra* Sections IV.F-G., the Company's full-year 2015 revenue guidance provided on February 17, 2015 did not account for the churn associated with the loss of the Vodafone Contract—a churn event Defendants themselves described as "material" and "significant"—despite that Defendants knew at the time that the Vodafone Contract would not, and could not, be renewed and that this would require the Company to ultimately lower its full-year 2015 guidance.  Defendants' statements reaffirming the 2015 full-year guidance were therefore materially false and misleading.

### H.    March 11, 2015 Deutsche Bank Media, Internet & Telecom Conference

132.    On March 11, 2015, Rackspace's VP of Finance, Jason Luce, presented on behalf of Rackspace at the Deutsche Bank Media, Internet & Telecom Conference.  During the conference, Jason Luce reassured investors that Rackspace was "now on our third consecutive quarter of accelerating growth."

133.    Jason Luce also discussed the Company's full-year 2015 guidance:  "Our margin levels are as high as they've ever been.  Our all-in returns are approaching 20%; they're in the high teens.  ***And we gave guidance for this year to basically get better on all of those metrics of growth, margins and returns***."

134.    These statements made during the Deutsche Bank Media, Internet & Telecom Conference about the Company's full-year 2015 guidance were materially false and misleading

because Defendants failed to disclose that the Vodafone Contract could not be renewed after the

data had been migrated to Africa, and that this was a material and significant churn event that

would have a substantial near-term financial impact on the Company's 2015 recurring revenues

and growth.  Indeed, as Defendants later revealed on May 27, 2015, *see supra* Sections IV.F-G.,

the Company's full-year 2015 revenue guidance provided on February 17, 2015 did not account

for the churn associated with the loss of the Vodafone Contract—a churn event Defendants

themselves described as "material" and "significant"—despite that Defendants knew at the time

that the Vodafone Contract would not, and could not, be renewed and that this would require the

Company to ultimately lower its full-year 2015 guidance.  Defendants' statements reaffirming

the 2015 full-year guidance were therefore materially false and misleading.

       **I.**       **May 11, 2015 Press Release and Earnings Conference Call**

      135.     On May 11, 2015, Rackspace issued and filed with the SEC a press release

announcing its first quarter 2015 financial results (the "May 11, 2015 Press Release") on Form 8-

K, signed by Defendant Pichler.  In the May 11, 2015 Press Release, the Company reported net

revenue of $480 million, which missed analysts' consensus estimates of $481 million.

      136.     In the May 11, 2015 Press Release, Defendant Rhodes touted the Company's

"profitable growth . . . through a rising number of new, larger enterprise customers":

> We delivered on our promises in the first quarter and are better
> positioning ourselves to benefit from the rapid growth of the
> managed cloud market. . . .  ***The execution of our strategy is
> driving profitable growth for Rackspace, including through a
> rising number of new, larger enterprise customers***.

      137.     In the May 11, 2015 Press Release, Rackspace also provided revenue guidance for

the second quarter of 2015:  "For the second quarter of 2015, Rackspace expects revenue to grow

between 1.5 percent and 2.5 percent on a constant currency basis and adjusted EBITDA margins

to be between 32 percent and 34 percent." This guidance was below analysts' consensus estimates, which forecasted revenue growth of 4.2% for the second quarter.

138.    The Company also held an earnings conference call on May 11, 2015 (the "May 11, 2015 Earnings Call") to discuss the Company's first-quarter 2015 financial results and the second-quarter 2015 guidance. Defendants Rhodes and Pichler both participated in the May 11, 2015 Earnings Call. During the call, Defendant Rhodes discussed the "factors that will affect [the Company's] guidance for the second quarter [of 2015]," which included the announcement that Rackspace had lost one of its "largest and longest-tenured customers," i.e., Vodafone, which the Company did not identify by name:

> Next, *we have a one-time revenue headwind in the second quarter*, resulting from a unique circumstance. For data sovereignty reasons, *one of our largest and longest-tenured customers was forced to move their production element of a large environment from our data center in the UK, to a location in Africa, where Rackspace does not have a data center*. This results in a one-time revenue reduction at the beginning of the second quarter. *We retain all other environments, and a healthy relationship with this customer, and expect to grow this revenue back with them over time*.

139.    Despite this announcement, Defendant Rhodes explained that the Company would not change its full-year 2015 guidance:

> Despite our slower start to the year, *we are not making changes to our full-year guidance range for revenue growth and adjusted EBITDA margin. Our pipeline is building nicely, and we expect that our sales activities will improve during the second quarter, and create higher revenue growth in the second half of the year*.

140.    During the question-and-answer segment of the May 11, 2015 Earnings Call, Defendant Rhodes explained that the Company's confidence in being able to hit its full-year 2015 guidance, despite the second-quarter revenue "headwind" that caused a lower-than-expected guidance for the second quarter, reflected the strength of its "pipeline":

> *The confidence, for us, it comes from pipeline, frankly.  And it comes from the fact that yes, we know we have signed a couple of these that will materialize in Q3, and drive revenue*.

141.     Defendant Pichler also explained that the Company expected to be within the full-year 2015 guidance range: "[W]e are expecting to be within the range."

142.     Later on the call, Defendants Pichler and Rhodes had the following exchange with an analyst about the Company's announcement that it was facing a revenue headwind in the second quarter.  Defendants described the headwind as "material" and "significant" but refused to provide additional details on the announcement:

> [**Analyst**]:  Thanks very much.  Karl, would it be possible to size the Q2 churn impact, just so we get a sense of how much we're dealing with here?  And then Taylor, you made some comments, earlier in your remarks, just about the competitive landscape.  And I think you talked about some of the challenges some of your competitors have.  Can you just update us on that?  Where you stack up versus some of the Telcos, and some of the legacy IT companies?  And how you're doing in the RFPs, et cetera, pricing trends?
>
> [**Defendant Pichler**]:  *Yes, we're not going to specifically articulate what that single customer event is, in terms of percentage contribution, but it's not insignificant*.
>
> [**Defendant Rhodes**]:  Yes, Simon, the reason we decided to mention it – and we've never done it before – *is it is material, and it is significant*.

143.     Defendants' statements in the May 11, 2015 Press Release and on the May 11, 2015 Earnings call about the impact of losing the Vodafone Contract and the Company's ability to meet its full-year 2015 guidance were materially false and misleading because Defendants failed to disclose that the loss of the Vodafone Contract meant that the Company would be unable to meet its full-year 2015 guidance.  Indeed, as Defendants later revealed on May 27, 2015, *see supra* Sections IV.F-G., the Company's full-year 2015 revenue guidance did not account for the churn associated with the loss of the Vodafone Contract—a churn event

Defendants themselves described as "material" and "significant"—and yet Defendants

reaffirmed this guidance on May 11, 2015.

> **J.     May 19, 2015 JPMorgan Global**
> **Technology, Media, and Telecom Conference**

144.    On May 19, 2015, Defendant Pichler presented on behalf of Rackspace at the

JPMorgan Global Technology, Media, and Telecom Conference.  During the conference,

Defendant Pichler was asked about the Company's weak second-quarter 2015 guidance and how

the Company expected to hit its full-year 2015 guidance, to which he responded:

> Yes.  Okay, so what we have – what happened, as expected, is that
> we had fairly slow activity in December, January, and early
> February, which is fairly consistent with what we have seen in
> prior years.  We have successfully denied the sales reps the excuse
> that our business is seasonal, but it is.  So, it has certainly become
> more seasonal the more revenue contribution we get from larger
> enterprising type customers, because they do indeed go on vacation
> and the budget cycles are not entirely done by the time the year
> starts.
>
> So the activity is considerably slower in December/January
> timeframe.  We have seen that in the past.  It has been more
> pronounced this year.  So we have seen improvement in March
> relative to February.  We have seen improvement in April relative
> to March.  ***So we are on a positive trajectory, but we are still a***
> ***little bit behind of where we need to be.***  So that is factor number
> one for the Q2 guidance.
>
> And then factor number two was really timing-related.  We felt we
> wanted to give a little bit more color in terms of how the intra-
> quarter months are materializing.  So, once a deal is booked, there
> is materialization that happens afterwards and ***we had kind of the***
> ***perfect storm in terms of a large opportunity was pushed back to***
> ***a late Q2 start and a churn situation was effective April 1.***

145.    Defendants' statements during the JPMorgan Global Technology, Media, and

Telecom Conference were materially false and misleading because Defendants failed to disclose

that the loss of the Vodafone Contract meant that the Company would be unable to meet its full-

year 2015 guidance.  Indeed, as Defendants later revealed on May 27, 2015, *see supra* Sections

IV.F-G., the Company's full-year 2015 revenue guidance did not account for the churn associated with the loss of the Vodafone Contract—a churn event Defendants themselves described as "material" and "significant"—and yet Defendants reaffirmed this guidance on May 19, 2015.

**K.**    **May 27, 2015 Cowen Technology, Media & Telecom Conference**

146.    On May 27, 2015, Defendant Pichler presented on behalf of Rackspace at the Cowen Technology, Media & Telecom Conference.  During the conference, Defendant Pichler was asked specifically about whether the loss of the Vodafone Contract was assumed into the Company's full-year 2015 guidance:

> [**Analyst**]:  So related to second-quarter 2015 guidance, on your first-quarter call you provided 2Q guidance that was about $10 million lower than expected and you attributed it to two things. One was a one-off churn event and the other was delayed installs for some bigger deals, so let's talk about the churn first.
>
> As it relates to churn, you said you had one large customer that, for data sovereignty issues, was forced to move a piece of their footprint that was hosted in the UK facility to Africa starting on April 1.  I know you haven't mentioned the name, but there are a few articles online that mention the customer's name and that the migration had been planned for some time.  Can you tell us when you found out about that customer planning on migrating? And how was that – what you had originally assumed in your 2015 guidance, which you just provided on February 17?
>
> [**Defendant Pichler**]:  Right.  Let me take a step back and talk a little bit about the history of this customer relationship.  This has been a customer that has grown a lot with us over the years.  It's one of our largest customers in the Company and the largest one in our UK business.
>
> What we do for them, they are a telco company that has a product that allows payments to be facilitated through cell phones, and they use this technology to serve markets across a couple of countries in the African continent.  And the growth that we have seen with them was largely due to the success of that product and then also extension into new countries.

And so over the years – this is a company that has considerable internal resources themselves.  They have been under pressure to utilize their own resources.  We have had a situation in 2011 where we RFP-ed against their in-house IT department and we lost.  We basically lost an additional footprint that was to be deployed.

They went back and tried to deploy it on their own, acquired the capital, and eventually came back to us because they couldn't get it to run the way that they wanted it to run.  So we have a long-standing relationship with them; I guess a mutually beneficial one.  One that has always been characterized by their need or desire or pressure to deploy certain stuff either in-house or in the countries where they provide their service to the end customer.

So I would say that there is a long-standing debate back and forth and there were some churn events in the past, and there are definitely going to be churn events in the future, but in general, over the relationship – the period of the relationship this has been a net positive grower.

***So in this specific case we have been – known about this.  We have been talking about this.  These are agreements that are being finalized and that one has been finalized shortly before the specifics of the renewal of the contract has been finalized in late Q1.***

147.   The analyst continued to press for additional information:

[**Analyst**]:  So you had your call on February 17.  It sounds like then you had – you finalized the churn situation shortly thereafter and then obviously happened on April 1.

But based on what I read online, it seems like this had been planned for some time, this migration.  So I would assume that at least them churning – maybe it wasn't April 1, but them churning was assumed in guidance.  Is that a fair assumption?

[**Defendant Pichler**]:  Yeah, specifically – the thing is that we have – if you think about the components of churn, there's defection churn and downgrade churn.  Defection churn is somewhere between 0.5% and 1%, fairly consistent on a monthly basis in our subscription business, and then we have downgrade-related churn that is somewhere around 1% roughly.  And so we don't explicitly use certain – other than when we know a very specific large event is going to occur at a specific time, the way that we plan is that this is normal run rate of the churn situation.

> *So it's not really something that we plan out for the very far future, because in a lot of instances the churn situation gets delayed or accelerated or the timing is not clear.  So we don't really – we factor in a churn assumption and then the specific timing is what creates volatility around the outcome*.

> [**Analyst**]: It sounds like you've – the response is that you always assume some churn in the business, whether it's your customer or somebody else, and there was no explicit assumption made for this particular customer because who knows if it was going to happen or not based on –

> [**Defendant Pichler**]: And the specific timing

> [**Analyst**]: how they come back towards the timing?  Got you.

148.    Defendant Pichler explained that the timing of the "churn event" (i.e., the loss of the Vodafone Contract) had a more significant impact on the Company's second-quarter 2015 guidance than the other identified factor:  "The churn had certainly a bigger impact of the two, because of [sic] it was April 1 and *it was quite significant*."

149.    Despite that the Company issued a weak second-quarter 2015 earnings guidance, Defendant Pichler again affirmed the Company's full-year 2015 earnings guidance:

> [**Analyst**]:  So want to shift over to 2015 guidance.  Despite the weak 2Q guidance, you maintained 2015 guidance and, as you've already said, to hit the low end it would imply about 3.8% sequential growth in the third and fourth quarter.  This doesn't seem overly aggressive, considering the greater than 4% growth you just did in third and fourth quarter of last year, as well as management comments that your pipeline and backlog are strong.

> But what can you tell investors that can assure them about the Company's ability to execute?  It seems like that's where the real point of contention really is right now.

> [**Defendant Pichler**]:  As I mentioned before, in terms of assurance, we need to execute, so there's no guarantee for execution success.  Having said that, it is a pattern that has repeated itself year after year.  We have always had more activity and more success in the middle of the year.  We always had a sluggish start of the year.  We had a very slow start to last year and had a nice acceleration in the past.

Again, we don't really see any discontinuation in lead flows. We have a pipeline visibility in the larger opportunities. We have consistency on the smaller deals, where we don't have a lot of visibility but more consistency. ***So, again, we need to accelerate and that's our goal and our intentions***.

150.     Defendants' statements during the Cowen Technology, Media & Telecom Conference reaffirming the Company's full-year 2015 earnings guidance and downplaying the loss of the Vodafone Contract were materially false and misleading because Defendants failed to disclose that the loss of the Vodafone Contract meant that the Company would be unable to meet its full-year 2015 guidance. Indeed, despite revealing on May 27, 2015 that the Company's full-year 2015 revenue guidance did not account for the churn associated with the loss of the Vodafone Contract—a churn event Defendants themselves described as "material" and "significant"—Defendants nevertheless reaffirmed this guidance during the Cowen Technology, Media & Telecom Conference.

## VI.     ADDITIONAL ALLEGATIONS OF SCIENTER

151.     Additional facts give rise to the strong inference of scienter that, throughout the Class Period, Defendants were aware that Vodafone had already initiated extensive data migration away from Rackspace's servers and would not, and could not, renew the Vodafone Contract.

152.     *First*, Defendant Pichler admitted during the May 27, 2015 Cowen Technology, Media & Telecom Conference that Rackspace had been aware of the data migration and the loss of the Vodafone Contract. Indeed, during that conference, Defendant Pichler stated: "***So in this specific case we have . . . known about this. We have been talking about this***," *see supra* Section IV.G.

153.     *Second*, Expert A, an expert in cloud hosing contracts, further confirms that Defendants had to have known that the Vodafone Contract would not be renewed well in

49

advance of the contract's termination date.  Expert A explained that, pursuant to what is typical
of managed cloud hosting contracts, Rackspace would have had between six and ninth months'
notice that Vodafone would not renew the Vodafone Contract.  Because of the inherent
complexity of managed cloud hosting contracts, Expert A explained that a vendor's executive
officers would typically seek information beginning one year before contract renewal/expiration
that would provide an early warning sign that the contract would not be renewed.  In this case,
Expert A opined that, given the nature of the contract and of Vodafone's business model,
Rackspace would have had actual or constructive notice at a minimum of six-to-nine months
before the contract expiration date.

154.    Furthermore, Expert A explained that the M-Pesa data migration was a massive
undertaking that would have required Rackspace employees to be involved in any transition of
data from Rackspace to the new provider.  Expert A also opined that, given the large volume of
M-Pesa data stored and managed by Rackspace, the migration would have been a gradual
migration that likely happened over the course of several months.

155.    *Third*, CW1's statements confirm that Defendants knew or should have known
that Vodafone was migrating the M-Pesa data and that, as a result, the Vodafone Contract was
not going to be renewed.  CW1, who worked as the Head of Sales in London, where Vodafone is
based, learned that Vodafone was migrating its data off of Rackspace's servers because they
were going to bring that data in-house.  CW1 also revealed that it was known beginning in mid-
to-late 2014 that Vodafone would not renew the contract and that there was an emphasis on
finding new business to make up for the expected loss of revenue from the Vodafone account:
"We knew this was happening, so the company had to find other business to compensate for
Vodafone." CW1 further explained that given the nature of Vodafone as a customer—a type of

customer that Rackspace did not typically compete for—CW1 knew that the loss of the Vodafone Contract would have had a "material impact on the company's business."

156.    *Fourth*, the Individual Defendants' knowledge about the loss of the Vodafone Contract can be inferred because these facts are critical to the Company's core operations. Defendants themselves described Vodafone as "one of [its] largest and longest-tenured customers" and described the impact of the loss of this contract as "material" and "significant." Knowledge of the impending non-renewal of this contract can therefore be inferred. Furthermore, before being named CEO, Defendant Rhodes served as Managing Director of the International Segment from 2011 until September 2013, and therefore was particularly knowledgeable about the Vodafone Contract, considering that Vodafone was one of the Company's largest customers in that segment.

157.    *Fifth*, Defendants' motive to commit fraud can be inferred from insider stock sales that were suspiciously timed and out of line with their prior trading practices.  As a result of these Class Period trades, insiders profited from the artificial inflation embedded in the trading prices of Rackspace common stock caused by Defendants' false and misleading statements and omissions to investors during the Class Period.

158.    On February 19, 2015—just two days after Rackspace issued its full-year 2015 guidance—Rackspace Director Lewis J. Moorman executed 134,000 options at the price of $2.50 and $12.85 while the stock was trading at around $49.50.  Director Moorman then sold a total of 447,700 shares for more than $19 million.  This sale represented more than 50% of Director Moorman's pre-sale stock holdings and was the highest quantity of shares he ever sold. Indeed, during the nine months preceding the Class Period, Director Moorman did not sell a single share of Rackspace stock.

159.     On April 27, 2015—just before Defendants' first corrective disclosure—Director

Moorman unloaded even more of his Company stock.  He executed 34,000 options—for $5.09 or

$10.30—while the stock traded at around $55.  He then sold those shares and an additional

66,000 shares from his shrinking Rackspace holdings for approximately $5.5 million, putting his

cumulative Class Period proceeds at more than $24 million.

160.     Defendant Pichler also profited from the Company's inflated stock price.  On

January 2, 2015, Defendant Pichler executed 7,604 options to purchase Rackspace stock at a

price of $2.50 and immediately sold those share while the stock was trading above $47.

Defendant Pichler pocketed at least $339,350 in profits.  Before this date, Defendant Pichler had

never executed an option to purchase Rackspace stock.  Moreover, Defendant Pichler never sold

more than 671 shares of Rackspace stock on a single day before the January 2, 2015 sale, and in

the nine months preceding the Class Period he sold a total of only 1,524 shares—all in

connection with the payment of taxes upon the vesting of prior incentive stock awards.

161.     Defendant Pichler's suspicious stock trading continued during the Class Period.

On March 30, 2015—days after the Company touted and affirmed its full-year 2015 guidance at

the Deusche Bank Media, Internet & Telecom Conference and just before the Vodafone Contract

expired—Defendant Pichler exercised more than 10 times the number of options previously

exercised on January 2, 2015, and sold the resulting 83,646 shares of stock for $4.1 million in net

profit.  Although Defendant Pichler's stock sales were pursuant to a pre-arranged trading plan,

the number of shares sold in this transaction and the January 2, 2015 transaction were

uncommon, and indeed unheard of, for Defendant Pichler.

162.     In sum, during the Class Period, Director Moorman and CFO Pichler sold more

than $28 million of their Company holdings.

## VII.   LOSS CAUSATION

163.   During the Class Period, as detailed herein, Defendants engaged in a course of conduct that artificially inflated the price of Rackspace common stock and operated as a fraud or deceit on Class Period purchasers of Rackspace common stock by failing to disclose and misrepresenting the material risks detailed herein.  As Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Rackspace common stock declined significantly as the prior artificial inflation came out of the Company's common stock prices.

164.   As a result of their purchases of Rackspace common stock during the Class Period, Lead Plaintiff and the other Class members suffered economic loss (i.e., damages) under the federal securities laws.  Defendants' false and misleading statements had the intended effect and caused Rackspace common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $56.20 per share on April 27, 2015.

165.   By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of Rackspace's business and prospects.  As the truth about the Company was revealed to the market, the price of Rackspace common stock fell significantly. These declines removed the inflation from the price of Rackspace common stock, causing real economic loss to investors who had purchased Rackspace common stock during the Class Period.

166.   The declines in the price of Rackspace common stock after the corrective disclosures came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market.  The timing and magnitude of the price declines in Rackspace common stock negate any inference that the loss suffered by Lead Plaintiff and the other Class members was caused by changed market conditions,

macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

167.    During the Class Period, the price of Rackspace common stock declined as the true state of Rackspace's operations was revealed to the investing public.  The truth about Rackspace's business was disclosed through corrective disclosures between May 11, 2015 and August 10, 2015.  From Rackspace's May 11, 2015 announcement of weak first-quarter 2015 earnings and a lower-than-expected second-quarter 2015 guidance, to the August 10, 2015 announcement that the Company would have to lower its full-year 2015 guidance, Rackspace common stock decline 47.97% (from an intraday high of $56.20 on April 27, 2015 to close at $29.24 per share on August 11, 2015).

168.    The economic loss, i.e., damages, suffered by Lead Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Rackspace common stock and the subsequent significant decline in the value of Rackspace common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## VIII.   PRESUMPTION OF RELIANCE

169.    At all relevant times, the market for Rackspace common stock was efficient for the following reasons, among others:

(a)    Rackspace common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    As a regulated issuer, Rackspace filed periodic reports with the SEC and NYSE;

(c)    Rackspace regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases

on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

> (d)     Rackspace was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers.  Each of these reports was publicly available and entered the public market place.

170.    As a result of the foregoing, the market for Rackspace common stock reasonably promptly digested current information regarding Rackspace from all publicly available sources and reflected such information in the price of Rackspace common stock.  Under these circumstances, all purchasers of Rackspace common stock during the Class Period suffered similar injury through their purchase of that common stock at artificially inflated prices, and a presumption of reliance applies.

171.    Further, to the extent that Defendants concealed or improperly failed to disclose material facts with regard to the Company, Lead Plaintiff is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153 (1972).

## IX.     INAPPLICABILITY OF THE STATUTORY SAFE <br> HARBOR AND BESPEAKS CAUTION DOCTRINE

172.    The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Consolidated Complaint.

173.    Defendants acted with scienter because at the time that they issued public documents and other statements in the Company's name they knew, or with extreme recklessness disregarded, the fact that such statements were materially false and misleading or omitted

material facts.  Moreover, Defendants knew such documents and statements would be issued or disseminated to the investing public, knew that persons were likely to rely upon those misrepresentations and omissions, and knowingly and recklessly participated in the issuance and dissemination of such statements and documents as primary violators of the federal securities laws.

174.    As set forth in detail throughout this Consolidated Complaint, Defendants, by virtue of their control over, and/or receipt of, the Company's materially misleading statements and their positions with the Company that made them privy to confidential proprietary information, used such information to artificially inflate the Company's financial results. Defendants were informed of, participated in, and knew of the improprieties and unlawful conduct alleged herein and understood their material effect on the Company's business and future prospects.  With respect to non-forward-looking statements and omissions, Defendants knew and recklessly disregarded the falsity and misleading nature of that information, which they caused to be disseminated to the investing public.

175.    Alternatively, to the extent that the statutory safe harbor applies to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and/or the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that those statements were false when made.  Moreover, to the extent that Defendants issued any disclosures designed to "warn" or "caution" investors of certain "risks," those disclosures were also false and misleading because they did not disclose that Defendants

were actually engaging in the very actions about which they purportedly warned and/or had actual knowledge of material adverse facts undermining such disclosures.

## X.  CLASS ACTION ALLEGATIONS

176.    Lead Plaintiff brings this action on its own behalf and as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons and entities that purchased or otherwise acquired the publicly traded common stock of Rackspace from November 11, 2014 through August 10, 2015, inclusive, and were allegedly damaged thereby (the "Class").  Excluded from the Class are:  Defendants; members of the immediate families of the Individual Defendants; Rackspace's subsidiaries and affiliates; any person who is or was an officer or director of Rackspace during the Class Period; any entity in which any Defendant has a controlling interest; Rackspace's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and the legal representatives, heirs, successors, and assigns of any such excluded person or entity.

177.    The members of the Class are so numerous that joinder of all members is impracticable.  During the Class Period, Rackspace had between approximately 142 million and 143 million shares of common stock outstanding and actively trading on the NYSE.  While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that the proposed Class numbers in the thousands and is geographically widely dispersed.  Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

178.     Lead Plaintiff's claims are typical of the claims of the members of the Class.  All members of the Class were similarly affected by Defendants' allegedly wrongful conduct in violation of the Exchange Act as complained of herein.

179.     Lead Plaintiff will fairly and adequately protect the interests of the members of the Class.  Lead Plaintiff has retained counsel competent and experienced in class and securities litigation.

180.     Common questions of law and fact exist as to all members of the Class, and predominate over any questions solely affecting individual members of the Class.  The questions of law and fact common to the Class include:

(a)     whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

(b)     whether the statements made to the investing public during the Class Period contained material misrepresentations or omitted to state material information;

(c)     whether and to what extent the market price of Rackspace common stock was artificially inflated during the Class Period because of the material misstatements alleged herein;

(d)     whether Defendants acted with the requisite level of scienter;

(e)     whether the Individual Defendants were controlling persons of the Company;

(f)     whether reliance may be presumed; and

(g)     whether the members of the Class have sustained damages as a result of the conduct complained of herein and, if so, the proper measure of damages.

181.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members of the Class is impracticable.  Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XI.     CAUSES OF ACTION

### COUNT I
### FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT
### AND SEC RULE 10b-5 PROMULGATED THEREUNDER
### (Against Defendant Rackspace and the Individual Defendants)

182.     Lead Plaintiff repeats and re-alleges every allegation set forth above as if fully set herein.

183.     This Count is asserted on behalf of all members of the Class against Defendant Rackspace and the Individual Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

184.     During the Class Period, Defendants disseminated or approved the false statements specified herein, among others, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

185.     Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in

59

acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of Rackspace common stock during the Class Period.  As detailed herein, the misrepresentations contained in, or the material facts omitted from, those statements included, but were not limited to the following:

(a)     Defendants' made positive statements about the Company's present and projected growth in the Company's international segment, international business operations, and churn rates, but failed to disclose that the Vodafone Contract would not, and could not, be renewed after the data had been migrated to Africa, and that this was a material and significant churn event that would have a substantial near-term financial impact on the Company's 2015 recurring revenues and growth;

(b)     Defendants' issued and reaffirmed full-year 2015 financial guidance that did not account for the loss of the Vodafone Contract—a churn event Defendants themselves described as "material" and "significant"—despite that Defendants knew at the time that the Vodafone Contract would not, and could not, be renewed and that this would require the Company to ultimately lower its full-year 2015 guidance;

(c)     Defendants reaffirmed the Company's full-year 2015 financial guidance even after disclosing the loss of the Vodafone Contract, but failed to disclose that the loss of this contract meant that the Company would be unable to meet its full-year 2015 guidance;

(d)     Defendants also failed to disclose in the Company's SEC filings (1) material events and known uncertainties that were reasonably likely to have a material adverse effect on its results of operations in violation of the disclosure requirements set forth in Item 303, and (2) significant, then-existing (as opposed to potential) factors that made the

securities more speculative or risky than the Company disclosed in violation of the disclosure requirements set forth in Item 503.

186.    Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiff and the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a severely reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of Rackspace common stock, which were intended to, and did: (a) deceive the investing public, including Lead Plaintiff and the Class, regarding, among other things, the Company's present and projected growth, international business operations, churn rates, and full-year 2015 financial guidance; (b) artificially inflate and maintain the market price of Rackspace common stock; and (c) cause Lead Plaintiff and other members of the Class to purchase Rackspace common stock at artificially inflated prices and suffer losses when the true facts became known.

187.    Defendant Rackspace is liable for all materially false and misleading statements made during the Class Period, as alleged above.

188.    The Individual Defendants are liable for the false and misleading statements they made and for which they were responsible, as alleged above.

189.    As described above, Defendants acted with scienter throughout the Class Period, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness.  The misrepresentations and omissions of material facts set forth herein, which

presented a danger of misleading buyers or sellers of Rackspace common stock, were either known to Defendants or were so obvious that Defendants should have been aware of them.

190.    The above allegations, as well as the allegations pertaining to the overall scope and breadth of the fraud at Rackspace, establish a strong inference that Defendants acted with scienter in making the materially false and misleading statements set forth above during the Class Period.

191.    Lead Plaintiff and the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for Rackspace common stock, which inflation was removed from its price when the true facts became known.  Lead Plaintiff and the Class would not have purchased Rackspace common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by these Defendants' misleading statements.

192.    As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages attributable to the fraud alleged herein in connection with their purchases of Rackspace common stock during the Class Period.

**COUNT II**
**FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT**
**(Against Defendants Rhodes and Pichler)**

193.    Lead Plaintiff repeats and re-alleges every allegation set forth above as if fully set herein.

194.    This Count is asserted on behalf of all members of the Class against each of the Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

195.    During their tenures as officers and/or directors of Rackspace, each of these Individual Defendants was a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act.  By reason of their positions of control and authority as officers

and/or directors of Rackspace, these Individual Defendants had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein.  These Individual Defendants were able to and did control, directly and indirectly, the content of the public statements made by Rackspace during the Class Period, including its materially misleading financial statements, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

196.    In their capacities as senior corporate officers of the Company, and as more fully described above, the Individual Defendants had direct involvement in the day-to-day operations of the Company, in reviewing and managing its regulatory and legal compliance, and in its accounting and reporting functions.  The Individual Defendants signed the Company's SEC filings during the Class Period, and were directly involved in providing false information and certifying and/or approving the false statements disseminated by Rackspace during the Class Period.  As a result of the foregoing, the Individual Defendants, as a group and individually, were controlling persons of Rackspace within the meaning of Section 20(a) of the Exchange Act.

197.    As set forth above, Rackspace violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Consolidated Complaint.  By virtue of their positions as controlling persons of Rackspace and as a result of their own aforementioned conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiff and the other members of the Class who purchased or otherwise acquired Rackspace common stock.  Moreover, as detailed above, during the respective times these Individual Defendants served as officers and/or

directors of Rackspace, each of these Individual Defendants was culpable for the material misstatements and omissions made by Rackspace, including such misstatements as the Company's false financial statements, as set forth above.

198.    As a direct and proximate result of these Individual Defendants' conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchase or acquisition of Rackspace common stock.

## XII.   <u>PRAYER FOR RELIEF</u>

WHEREFORE, Lead Plaintiff, on behalf of itself and the other members of the Class, prays for judgment as follows:

(a)     Declaring the action to be a proper class action pursuant to Federal Rule of Civil Procedure 23;

(b)     Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

(d)     Awarding such equitable, injunctive, and other relief as the Court may deem just and proper.

## XIII.   <u>JURY TRIAL DEMANDED</u>

Lead Plaintiff hereby demands a trial by jury of all issues so triable.

DATED:  November 3, 2017

MOTLEY RICE LLC

By: /s/ William H. Narwold
William H. Narwold
20 Church St., 17th Floor
Hartford, CT 06103
Telephone: (860) 882-1681
Facsimile: (860) 882-1682
bnarwold@motleyrice.com

   -and-

James M. Hughes (*pro hac vice*)
William S. Norton
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450
jhughes@motleyrice.com
bnorton@motleyrice.com

*Lead Counsel for Lead Plaintiff and the Class*

LABATON SUCHAROW LLP
Michael W. Stocker
Alfred L. Fatale III
Ross M. Kamhi
140 Broadway
New York, New York  10017-5563
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
mstocker@labaton.com
afatale@labaton.com
rkamhi@labaton.com

*Liaison Counsel for Lead Plaintiff and the Class*