USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 02/05/2019

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------- X
CITY OF WARWICK MUNICIPAL EMPLOYEES :
PENSION FUND et al., Individually and :
on Behalf of All Others Similarly :
Situated, :
                                    :
            Plaintiffs, :
                                    :               No. 17 Civ. 3501 (JFK)
       -against- :                                   **OPINION & ORDER**
                                    :
RACKSPACE HOSTING, INC., WILLIAM :
TAYLOR RHODES, and KARL PICHLER, :
                                    :
            Defendants. :
                                    :
----------------------------------- X

APPEARANCES

FOR LEAD PLAINTIFF KBC ASSET MANAGEMENT NV
       Jonathan Gardner
       Alfred Louis Fatale, III
       Ross Michael Kamhi
       LABATON SUCHAROW LLP
       James M. Hughes
       William H. Narwold
       William Stephen Norton
       MOTLEY RICE LLC

FOR PLAINTIFF CITY OF WARWICK MUNICIPAL EMPLOYEES PENSION FUND
       Francis Paul McConville
       Christopher J. Keller
       LABATON SUCHAROW LLP

FOR DEFENDANTS RACKSPACE HOSTING, INC., WILLIAM TAYLOR RHODES,
and KARL PICHLER
       Stephen Mark Dollar
       Peter Andrew Stokes
       NORTON ROSE FULBRIGHT US LLP


**JOHN F. KEENAN, United States District Judge:**

       Before the Court is a motion by Defendants Rackspace

Hosting, Inc. ("Rackspace"), William Taylor Rhodes ("Rhodes"),

1

and Karl Pichler ("Pichler") (collectively, the "Defendants") to dismiss the complaint in this class action brought by Lead Plaintiff KBC Asset Management NV's ("KBC"). For the reasons below, Defendants' motion is granted.

## I. Background

### A. Factual Background

The following facts and allegations are taken from the amended complaint and, for the purposes of this motion, must be deemed true.

### 1. The Parties

Lead Plaintiff KBC, a Belgium-based institutional investment company, brings this class action individually and on behalf of itself and all others (the "Class" or "Plaintiffs") who purchased or otherwise acquired common stock in Defendant Rackspace between November 11, 2014 and August 10, 2015 inclusive (the "Class Period"). (Am. Compl. at 1, ¶ 15, 176.)

Rackspace is a managed cloud computing company which offers Internet-based computing, data storage, and related services to its customers. (Id. ¶¶ 16, 25.) During the Class Period, Rackspace was traded on the New York Stock Exchange. (Id. ¶ 16.) Defendant Rhodes was, at all relevant times, Rackspace's Chief Executive Officer, President, and a member of its Board of Directors. (Id. ¶ 17.) Defendant Pichler is, and was at all

relevant times, Rackspace's Chief Financial Officer, Senior Vice President, and Treasurer. (Id. ¶ 18.)

## 2. The Vodafone Contract

During the Class Period, telecommunications company Vodafone was "a significant customer" within Rackspace's international segment and one of its three biggest customers overall. (Id. ¶ 34.) In 2007, Vodafone partnered with Safaricom, its partly-owned subsidiary, to launch a mobile phone application in Kenya called "M-Pesa," which allows users to deposit, transfer, and withdraw money. (Id. ¶ 35.) On August 9, 2010, Rackspace announced that Vodafone had renewed its contract with Rackspace (the "Vodafone Contract") to host M-Pesa data for five years, ending on April 1, 2015. (Id. ¶¶ 39, 41.)

Soon after its debut, M-Pesa expanded into other African countries and experienced significant user growth. (Id. ¶¶ 36-38, 44-48.) Soon thereafter, however, M-Pesa experienced "routine" service delays, interruptions, and outages, which prevented its customers from using the service. (Id. ¶¶ 48-49.) These issues allegedly arose because Rackspace was hosting M-Pesa data in Germany, meaning transactions had to be relayed from countries in Africa—where M-Pesa customers are primarily based—to Germany and back to Africa again. (Id. ¶¶ 43, 48.) To minimize these disruptions and lower costs, starting in 2013, Safaricom began to migrate the M-Pesa infrastructure from

Rackspace's servers to local hosts in Africa. (Id. ¶¶ 50-51.)
As Rackspace lacks Africa-based data centers, this choice
effectively meant the Vodafone Contract "would not, and could
not, be renewed." (Id.)

### 3. The Vodafone Churn Event

The Class Period begins on November 11, 2014—four and a
half months before the Vodafone Contract expired. (Id. ¶ 52.)
By then, Plaintiffs contend, Defendants "knew that the [Vodafone
Contract] would not, and could not, be renewed." (Id.)
Rackspace's business model is heavily dependent on recurring
monthly customers paying a fixed rate for its services, meaning
investors pay particularly close attention to (1) Rackspace's
quarter-to-quarter revenue growth, and (2) its "churn rate"—a
metric which measures the percentage of Rackspace customers who
discontinue their services over a given period. (Id. ¶¶ 30-32.)
Given the importance of these two metrics to Rackspace,
Defendants were aware that the loss of the Vodafone Contract
would cause a "material and significant" discontinuation of
service (the "Vodafone Churn Event"), which "would have a
substantial near-term financial impact on [Rackspace's] 2015
recurring revenues and growth." (Id. ¶ 52.)

### 4. Alleged False and Misleading Statements

Plaintiffs allege that Defendants intentionally concealed
the Vodafone Churn Event and its imminent effects from

investors, issuing "misleading reassurance and guidance regarding [Rackspace's] growth, customer retention, and churn rates." (Id.)  Plaintiffs cite at least thirty-four different statements—made across no fewer than thirteen press releases, earnings calls, financial filings, and industry conferences—that were allegedly "materially false and misleading" because they failed to disclose the significant detrimental effect the Vodafone Churn Event would have on Rackspace's full-year 2015 financial guidance. (Am. Compl. ¶¶ 98-102, 104-107, 110-112, 114-20, 123-34, 136-150.)  Plaintiffs further allege that some of these statements were materially false and misleading because they reaffirmed or were Rackspace's February 17, 2015 full-year 2015 guidance, which allegedly did not account for the Vodafone Churn Event. (Id. ¶¶ 132-34, 146-150).  Finally, Plaintiffs allege that statements made in two of Rackspace's SEC filings— its 2014 Form 10-Q (filed November 10, 2014) and full-year 2014 Form 10-K (filed March 2, 2015)—violated Items 303 and 503 of Regulation S-K (codified as 17 C.F.R. §§ 229.303 & 229.503 respectively) because in them Rackspace failed to disclose that the Vodafone Churn Event "would have substantial near-term financial impact" on Rackspace's 2015 recurring revenues and growth. (Am. Compl. ¶¶ 103-10, 123-25.)

### 5. Disclosures of the Vodafone Churn Event & Losses

On May 11, 2015, Defendants disclosed that Rackspace had lowered its second-quarter revenue growth expectations and attributed the adjustment to a "one-time revenue headwind" from one of Rackspace's "largest and longest-tenured customers" transferring its data to a location in Africa where Rackspace lacked a data center. (Id. ¶ 66.)  As a result, analysts lowered their Rackspace forecasts, and the price of Rackspace's shares fell 17.65 percent between May 11 and 13, 2015. (Id. ¶¶ 70-75.)

Defendant Pichler made a more detailed disclosure on May 27, 2015, allegedly causing share prices to fall by 1.83 percent and then an additional 4.23 percent. (Id. ¶¶ 77-83.)

On August 10, 2015, the Class Period's final day, Rackspace issued a press release announcing its second-quarter results and lowering its full-year 2015 revenue guidance to a range of 12 to 14 percent revenue growth from 14 to 18 percent. (Id. ¶¶ 84-85.) Plaintiffs allege that the effects of the Vodafone Churn Event forced these changes. (Id.)  As a result, Rackspace's share prices dropped 7.85 percent the next day. (Id. ¶ 86.)

### B. Procedural History

On May 1, 2017, Plaintiff City of Warwick Municipal Employees Pension Fund filed the original complaint in this consolidated class action.  On September 19, 2017, this Court appointed KBC as Lead Plaintiff.

On November 3, 2017, KBC filed the amended complaint,
alleging (1) a single cause of action for violation of Section
10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5
(17 C.F.R. § 240.10b-5) promulgated thereunder against all
Defendants, and (2) a single cause of action for violation of
Section 20(a) of the Exchange Act (15 U.S.C. § 78t(a)) against
Defendants Rhodes and Pichler. (Am. Compl. ¶¶ 182-198.)

On December 18, 2017, Defendants filed the instant motion
to dismiss.

## II. <u>Legal Standard</u>

To survive a motion to dismiss pursuant to Federal Rule of
Civil Procedure 12(b)(6), "a complaint must contain sufficient
factual matter . . . to 'state a claim to relief that is
plausible on its face.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678
(2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570
(2007)). The Court's charge in ruling on a Rule 12(b)(6) motion
"is merely to assess the legal feasibility of the complaint, not
to assay the weight of the evidence which might be offered in
support thereof." <u>Eternity Global Master Fund Ltd. v. Morgan
Guar. Trust Co. of N.Y.</u>, 375 F.3d 168, 176 (2d Cir. 2004)
(quoting <u>Geisler v. Petrocelli</u>, 616 F.2d 636, 639 (2d Cir.
1980)). The Court must construe the complaint in the light most
favorable to the plaintiff, "taking its factual allegations to
be true and drawing all reasonable inferences in the plaintiff's

favor." <u>Harris v. Mills</u>, 572 F.3d 66, 71 (2d Cir. 2009). The Court, however, is not required to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." <u>Iqbal</u>, 556 U.S. at 678. A complaint that offers such "labels and conclusions" or naked assertions without "further factual enhancement" will not survive a motion to dismiss. <u>Id.</u> (citing <u>Twombly</u>, 550 U.S. at 555, 557).

## III. <u>Discussion</u>

### A. Section 10(b) and Rule 10b-5 Violations

Defendants move to dismiss Plaintiffs' Section 10(b) and Rule 10b-5 claims because (1) Defendants' statements and omissions are (a) not actionable for various reasons and, even if they were, (b) do not rise to the level of fraud; (2) Plaintiffs have failed to plead facts establishing a strong inference of scienter; and (3) Plaintiffs have failed to allege loss causation in the August 2015 price drop. (Defs.' Mem. of Law in Supp. of Mot. to Dismiss at 14-25, ECF No. 39 (filed Dec. 18, 2017) [hereinafter "Supp."]).

To state a private claim under Section 10(b) and Rule 10b-5, a plaintiff must plead that (1) the defendant made a material misrepresentation or omission, (2) with scienter, (3) in connection with the purchase or sale of securities, and (4) the plaintiff relied on the misrepresentation or omission, thereby (5) causing economic loss. <u>Dura Pharm., Inc. v. Broudo</u>, 544 U.S.

336, 341-42 (2005); see also Lattanzio v. Deloitte & Touche LLP, 476 F.3d 147, 153 (2d Cir. 2007). Rule 10b-5 makes it unlawful to "make any untrue statement of a material fact" or "to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b).

## 1. Forward-Looking Statements

Defendants argue that certain statements relating to the "revenue guidance and projected growth rates at issue" were "plainly forward looking" and thus are inactionable as they were either (1) accompanied by adequate cautionary language or (2) not shown to have been made with actual knowledge of falsity. (Supp. at 16.)

A statement is "forward looking" when it contains "a projection of revenues, income (including income loss), earnings (including earnings loss) per share . . . or other financial items," or is "a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management." In re Supercom Inc. Sec. Litig., 15 Civ. 9650 (PGG), 2018 WL 4926442, at *18 (S.D.N.Y. Oct. 10, 2018)(quoting 15 U.S.C. § 78u-5(i)(1)(A),(C)). Further, "any statement of the assumptions underlying or relating to" a "forward looking" statement is itself forward looking. Id. (quoting 15 U.S.C. § 78u-

5(i)(1)(D)).  The Private Securities Litigation Reform Act

("PSLRA") establishes a safe harbor for "forward looking"

statements which makes them inactionable if "(1) 'the forward-

looking statement is identified and accompanied by meaningful

cautionary language,' (2) the forward looking statement 'is

immaterial,' or (3) 'the plaintiff fails to prove that [the

forward-looking statement] was made with actual knowledge that

it was false or misleading." In re Vivendi, S.A. Sec. Litig.,

838 F.3d 223, 245 (2d Cir. 2016) (quoting Slayton v. Am. Express

Co., 604 F.3d 758, 766 (2d Cir. 2010)). See also 15 U.S.C. §

78u-5(c)(1)(A)-(B).  Since the safe harbor is written in the

disjunctive, "a forward-looking statement is protected . . . if

any of the three prongs applies." Id. (quoting Slayton, 604 F.3d

at 766).

The Court concludes that the many of the statements on

which Plaintiffs rely are "forward looking."  First, Plaintiffs

have themselves conceded that eleven of their cited statements

are "forward looking." (See Pls.' Mem. of L. in Opp. to Defs.'

Mot. to Dismiss at 9-10, ECF No. 40 (filed Feb. 1, 2018)

[hereinafter "Opp."] (describing statements quoted in paragraphs

118, 119, 130, 133, 138 to 142, 144, and 149).  Second, the

Court finds that the statement "[f]or the second quarter of 2015,

Rackspace expects revenue to grow between 1.5 and 2.5 percent on

a constant currency basis and adjusted EBITDA margins to be

between 32 and 34 percent" (Am. Compl. ¶ 137) is "forward looking" as it states expected revenue growth and earnings before interest, tax, depreciation, and amortization (EBITDA) margins. As such, it is "a projection" of revenue and future economic performance by Rackspace's management. See 15 U.S.C. § 78u-5(i)(1)(A),(C). Third, the Court finds that, three statements Defendant Pichler made on May 27, 2015[1] are "forward looking" as, when read in context, these are clearly statements of the assumptions underlying or relating to the full-year 2015 guidance—itself a "forward looking" statement as it contains financial projections. See 15 U.S.C. § 78u-5(i)(1)(D); Am. Compl. ¶ 150 (alleging that the statements at paragraphs 146 through 149 reaffirm the full-year 2015 earnings).

The Court finds that all of the "forward looking" statements identified above are inactionable as Plaintiffs have not adequately pled that the relevant Defendants made them with the actual knowledge that they were false or misleading. The majority of the identified "forward looking" statements state

---

[1] See Am. Compl. ¶¶ 146 ("So in [the Vodafone Churn Event] we [knew] about this. We have been talking about this. These are agreement that are being finalized and that one has been finalized shortly before the specifics of the renewal of the contract has been finalized in late Q1."); 147 ("So [defection churn events are] not something that we plan out for the very far future, because in a lot of instances the churn situation gets delayed or accelerated or the timing is not clear. So we don't . . . factor in a churn assumption and then the specific timing is what creates volatility around the outcome."); 148 (the Vodafone Churn Event "was quite significant.").

that Rackspace would experience a certain amount of growth, give
general optimistic statements of that growth, or reaffirm
Rackspace's 2015 full-year guidance—a filing which anticipated
financial growth.[2]  Though Plaintiffs repeatedly failed to
specifically allege why they believe Defendants' actual
knowledge was incompatible with these generally positive
predictions, they do allege that Defendants knew the 2015
guidance "was unachievable without the recurring revenue from
the Vodafone Contract." (Am. Compl. ¶¶ 96, 185(c)).  The only
explanation Plaintiffs offer for how or why this was the case is
their allegation, quoting Confidential Witness 1's testimony,
that Vodafone was "a type of customer that Rackspace did not
typically compete for." (Id. ¶¶ 89, 155.)  Even affording
Plaintiffs every favorable inference, these allegations are
insufficient to support a conclusion that the Defendants knew
the 2015 guidance was necessarily unachievable absent the
Vodafone Contract.  Simply put, companies are regularly pushed
into taking non-typical actions in response to challenging
conditions and many do so successfully.  Further, these
allegations do not necessarily foreclose the possibility that
Defendants knew of or reasonably expected windfalls sufficient
to counteract the Vodafone Churn Event at the times they made

---

[2] See Am. Compl. ¶¶ 118; 119; 130; 133; 137; 139; 140; 141; 144; 146;
147; 149.

these statements.  Accordingly, Plaintiffs have not pled that

Defendants had the relevant actual knowledge that these "forward

looking" statements were false and misleading and they are thus

inactionable. In re Vivendi, 838 F.3d at 245.

Plaintiffs have also failed to plead that another

identified "forward looking" statement was false and misleading.

On a May 11, 2015 earnings call, Defendant Rhodes stated:

> [W]e have a one-time revenue headwind in the
> second quarter . . . one of our largest and
> longest-tenured customers were forced to move
> their production element of a large
> environment from our data center in the UK, to
> a location in Africa, where Rackspace does not
> have a data center.  This results in a one-
> time revenue reduction at the beginning of the
> second quarter. We retain all other
> environments, and a healthy relationship with
> this customer, and expect to grow this revenue
> back with them over time.

(Am. Compl. ¶ 138.)  The Court finds this statement inactionable

because Plaintiffs have not alleged that Rhodes did not believe,

at the time he made the statement, that (1) this was a one-time

headwind, (2) Rackspace still maintained a healthy relationship

with Vodafone and kept its other "environments," and (3)

Rackspace could not grow this revenue back with Vodafone.

Plaintiffs repeatedly allege that Safaricom's decision to host

the relevant data in Africa meant the Vodafone Contract would

not and could not be renewed.  These allegations are

insufficient to plead that Rhodes' statement was false, however,

because Rhodes did not say that he expected Vodafone's M-Pesa data business to return, but rather that he expected "to grow this <u>revenue</u> back with [Vodafone] over time." (<u>Id.</u> ¶ 138 (emphasis added)). Accordingly, Plaintiffs have failed to adequately allege that Rhodes made this statement with the actual knowledge that it was false or misleading and, as such, it is inactionable. <u>In re Vivendi</u>, 838 F.3d at 245.

The remaining three "forward looking" statements all attest to the significance or materiality of the Vodafone Churn Event. <u>See</u> Am. Compl. ¶¶ 142 (stating that the Vodafone Churn Event is "not insignificant," "material," and "significant"); 148 (the Vodafone Churn Event is "quite significant."). Though Plaintiffs state that these allegations are "false and misleading" (<u>id.</u> ¶¶ 143, 150), they themselves directly and repeatedly contradict that allegation by describing the Vodafone Churn Event as "material" and "significant" repeatedly through the amended complaint (<u>see, e.g.</u>, <u>id.</u> ¶¶ 102, 107, 110, 112, 117, 120, 124, 127, 131, 134, 185(a)), even directly quoting these statements to their advantage. (<u>See, e.g.</u>, <u>id.</u> ¶¶ 8, 59, 69, 76, 96, 112, 117, 131, 134, 143, 145, 150, 156, 185(b).) The Court, of course, is obliged to take all of these pleadings as true at this stage. <u>Harris</u>, 572 F.3d at 71. Accordingly, Plaintiffs have failed to adequately allege that Defendants made

these statements with the actual knowledge that they were false or misleading. In re Vivendi, 838 F.3d at 245.

## 2. Statements of Puffery

Defendants contend that several of the statements Plaintiffs quote are inactionable puffery. (Supp. at 19-20, 25.) It is well settled that "expressions of puffery and corporate optimism do not give rise to securities violations." Nguyen v. New Link Genetics Corp., 297 F. Supp. 3d 472, 488 (S.D.N.Y. 2018) (quoting Rombach v. Chang, 355 F.3d 164, 174 (2d Cir. 2004)). "People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business they manage." Id. However, "pollyannaish statements couched as rosy corporate-speak may be actionable if" (1) "they contradict facts known to a defendant," (2) are worded "as guarantees or are supported by specific statements of fact," or (3) "the speaker does not genuinely or reasonably believe them." In re Supercom, 2018 WL 4926442, at *22 (quoting IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC, 783 F.3d 383, 392 (2d Cir. 2015)). Although there is no definitive test to determine when a vague statement qualifies as puffery, "statements expressing a general view that 'things are going well,' that the company is 'well positioned,'

or that a year was 'successful' are generally not actionable."
In re Nevsun Res. Ltd., No. 12 Civ. 1845 (PGG), 2013 WL 6017402,
at *10 (S.D.N.Y. Sept. 2013).

Here, the Court finds that two of the statements cited by
Plaintiffs are inactionable puffery.  During the November 10,
2014 earnings call, Defendant Pichler is cited as saying
"[w]e've made good progress this year; our managed cloud
positioning has gained traction with customers and industry
experts.  We have strong alignment around our strategy, and the
distractions that we [had] to overcome earlier this year are now
behind us." (Am. Compl. ¶ 99.)  He further stated that "[w]e
feel good about our progress so far, and we'll update you on how
we think 2015 looks.  But again, we're committed to both revenue
growth and end margin." (Id. ¶ 101.)  These statements are
generally positive and of the type that other courts in this
circuit have found constitute puffery.  See, e.g., In re Supercom
Inc. Sec. Litig., 2018 WL 4926442, at *22 (finding a defendant's
remarks that the company was "progressing well in large and
small contracts" to be "too general to cause a reasonable
investor to rely on them"); Pollio v. MF Global, 608 F. Supp. 2d
564, 571 (S.D.N.Y. 2009) (statement that "the franchise is
performing well" was optimistic puffery).  Further, none of
these statements necessarily contradict Pichler's alleged
knowledge of the Vodafone Churn Event's effects, and Plaintiffs

16

have not made sufficient allegations to support a conclusion
that Pichler did not reasonably believe these statements when he
made them.  Finally, these statements are not worded as
guarantees or supported by any specific facts.  Accordingly,
they are inactionable puffery. Rombach, 355 F.3d at 174.

### 3. Statements of Opinion

Defendants argue that some of the statements Plaintiffs
cite are inactionable because they are nothing more than
statements of opinion. (Supp. at 20-21, 25.)  Statements of
opinion are those which "express expectations about the future
rather than presently existing, objective facts" often marked by
phrases such as "I believe." In re Supercom, 2018 WL 4926442 at
*22.  Liability for making a false statement of opinion may
exist if (1) "the speaker did not hold the belief she
professed"; (2) "the supporting fact she supplied were untrue";
or (3) "the speaker omits information whose omission makes the
statement misleading to a reasonable investor." Tongue v.
Sanofi, 816 F.3d 199, 210 (2d Cir. 2016) (citing Omnicare, Inc.
v. Laborers Dist. Council Constr. Indus. Pension Fund, 135 S.
Ct. 1318, 1326-32 (2015)).  A reasonable investor, upon hearing
a statement of opinion from an issuer, "expects not just that
the issuer believes the opinion (however irrationally), but that
it fairly aligns with the information in the issuer's possession
at the time. Id. at 1329.  The "core inquiry is whether the

omitted facts would 'conflict with what a reasonable investor would take from the statement itself.'" Id. To make such a showing, a plaintiff must "identify particular (and material) facts going to the basis for the [defendant's] opinion—facts about the inquiry the [defendant] did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." Id. at 1332. The Supreme Court has emphasized that meeting this standard is "no small task for an investor." Omnicare, 135 S. Ct. at 1332. "[R]easonable investors understand that opinions sometimes rest on a weighing of competing facts," meaning "a statement of opinion is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way." Id. at 1329.

Here, two statements on which the Plaintiffs rely are inactionable opinions. On November 14, 2014, as part of its Form 10-Q financial results filing, Rackspace stated "[w]e have limited experience operating in foreign jurisdictions other than the U.K. and Hong Kong and expect to continue to grow our international operations." (Am. Compl. ¶ 105.) Plaintiffs allege that this statement was also included verbatim in the full-year 2014 Form 10-K filed on March 2, 2015. (Id. ¶ 123.) Plaintiffs contend that both statements are "false and

misleading" as Defendants failed to disclose that the Vodafone Churn Event would occur and have an impact on Rackspace's 2015 recurring revenues and growth. (Id. ¶ 124.)

Considered in their full context, both statements are expressions of expectation about the future and include the language of opinion, but are not "forward looking" as they do not speak directly to Rackspace's economic position. They are therefore statements of opinion. In re Aratana Therapeutics Inc. Sec. Litig., 17-cv-880 (PAE), 2018 WL 2943743, at *15 (S.D.N.Y. June 11, 2018). Here, Plaintiffs have made no allegations that the Vodafone Churn Event would necessarily preclude the possibility that Rackspace's international operations could grow or that Defendants held that belief at the time they made these statements. Further, the omission of the Vodafone Churn Event does not make these statements necessarily misleading to a reasonable investor as, it is merely a fact cutting in the other direction, not necessarily dispositive on this issue. Accordingly, Plaintiffs have failed to allege facts with the necessary specificity to plausibly allege that these statements of opinion were false and misleading. They are, thus, inactionable. Omnicare, 135 S. Ct. at 1326-27, 1332.

### 4. Statements Pled with Insufficient Particularity

Defendants argue that Plaintiffs have failed to state their claims with the necessary particularity to make them actionable.

A claim under Section 10(b) of the Securities Exchange Act must meet the pleading requirements of both Rule 9(b) of the Federal Rules of Civil Procedure and the PSLRA. See In re Sanofi Sec. Litig., 155 F. Supp. 3d 386, 397-98 (S.D.N.Y. 2016); 15 U.S.C. § 78u-4(b). Rule 9(b) requires that the complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007). The PSLRA provides that a plaintiff bringing a securities fraud claim must, at the pleading stage "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which the belief is formed." ATSI Commc'ns, 493 F.3d at 99 (quoting 15 U.S.C. § 78u-4(b)(1)(B)). Accordingly, "plaintiffs asserting claims under Section 10(b) and Rule 10b-5 'must do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so." In re Supercom, 2018 WL 4926442, at * 24 (quoting Carpenters Pension, 750 F.3d at 236 (quoting Rombach, 355 F.3d at 174)) (internal brackets removed).

Here, the Court finds that the statements that it has not thus far considered—quoted in paragraphs 98, 100, 104, 106, 111, 114, 115, 123, 126, 128, 129, 132, and 136 of the amended complaint—are inactionable as Plaintiffs have failed to meet the PLSRA's particularity requirements.  Plaintiffs—in repeated identical or near-identical language—allege that each of the aforementioned statements was "materially false and misleading because Defendants failed to disclose that the Vodafone Contract could not be renewed after the data had been migrated to Africa, and that this was a material and significant churn event that would have a substantial near-term financial impact on the Company's 2015 recurring revenues and growth."[3]

Ten of these statements describe Rackspace's present and future performance positively.[4]  As noted above, Plaintiffs have

---

[3] See Am. Compl. ¶¶ 102; 107; 112; 117; 124; 127; 131; 134; 143.

[4] See ¶¶ 98 ("We are . . . encouraged by the momentum we are seeing in the business . . . We are poised to capitalize on the massive opportunity ahead in the managed cloud market, where we see increasing demand for our managed services and expertise."); 100 ("First, strong growth results. Our constant currency growth rate of 4.4% was the highest in almost 2 years.  We saw good growth across our product, had traction with new customers as well as our installed base, and we are winning deals of considerable size consistently."); 111 ("Our international business today is, again about . . . 30% of our business overall.  It's growing nicely.  It's predominantly a UK and EMEA business."); 114 ("Our fourth-quarter results represent another quarter of strong growth and improving margins for Rackspace.  We believe that the progress and momentum that we built in the quarter and throughout 2014, demonstrates the success of our strategy and our position as the world's number one managed cloud company"); 115 (stating Rackspace "continued [its] international expansion" during the fourth quarter 2014); 116 ("Our UK business is a great business. It has very low churn rates, a little bit better than Rackspace overall . . . It's growing well and we feel like we do very, very well

explained that Defendants made these statements "despite knowing that the guidance was unachievable without the recurring revenue from the Vodafone Contract." (Id. ¶¶ 96, 185(c))  As an explanation for how and why this is the case, Plaintiffs have offered only that Vodafone is the "type of customer Rackspace did not typically compete for." (Id. ¶¶ 85, 155).  As the Court explained above, these allegations are insufficient to explain "the reason or reasons why" these statements are necessarily false or misleading.  Accordingly, Plaintiffs have failed to meet Rule 9(b) or the PSLRA's specificity standards and these statements, too, are inactionable. ATSI Commc'ns, 493 F.3d at 99 (quoting 15 U.S.C. § 78u-4(b)(1)(B)); In re Supercom, 2018 WL 4926442, at * 24.

Additionally, Plaintiffs have alleged that certain statements, made as part of Rackspace's third-quarter 2014 Form 10-Q (see Am. Compl. ¶¶ 104, 106) and full-year 2014 Form 10-K filings (id. ¶ 123), were materially false and misleading for

_____

as the market leader there in terms of brand."); 126 ("[W]e're executing our model. You're seeing three quarters now of sequentially improved growth quarter over quarter.  And importantly, also, we are starting to see an expansion of our business market into enterprise where we are winning more and more large deals."); 128 ("We have about 30% of our revenue overseas and its growing well."); 129 (describing Rackspace's churn rates as "remarkably stable"); 132 (Rackspace is "now in our third consecutive quarter of accelerating growth"); 136 (stating Rackspace has "profitable growth . . . through a rising number of new, larger enterprise customers . . . The execution of our strategy is driving profitable growth for Rackspace, including through a rising number of new, larger enterprise customers.").

the same reasons—and in identical language—as those statements directly above. (Id. ¶¶ 107, 123-24.) These statements are:

> Our existing customers could elect to reduce or terminate the services they purchase from us because we do not have long-term contracts with our customers, which could adversely affect our operating results. Customer contracts for our managed dedicated hosting services typically have initial terms of one to two years which, unless terminated, may be renewed or automatically extended on a month-to-month basis. . . . Any failure by us to continue to retain our existing customers could have a material adverse effect on our operating results.

> Our physical infrastructure is concentrated in a few facilities, and any failure in our physical infrastructure or services could lead to significant costs and disruptions and could reduce our revenue, harm our business reputation and have a material adverse effect on our financial results. . . . Since our ability to attract and retain customers depends on our ability to provide customers with highly reliable service, even minor interruptions in our service could harm our reputation . . . . While we have not experienced a material increase in customer attrition following these events, the extent to which our reputation suffers is difficult to assess. . . However, service interruptions continue to be a significant risk for us and could materially impact our business.

(Id. ¶¶ 104, 106.) These statements are nothing more than general risk statements concerning Rackspace's business and even disclose the possibility of an event like the Vodafone Churn Event. Plaintiffs have offered no explanation as to why these statements are false or misleading. Accordingly, Plaintiffs

have again failed to meet Rule 9(b) or the PSLRA's specificity standards and these statements are inactionable. <u>ATSI Commc'ns</u>, 493 F.3d at 99; <u>In re Supercom</u>, 2018 WL 4926442, at *24.

### 5. Item 303 and 503 Violations

Plaintiffs allege that certain statements made as part of Rackspace's third-quarter 2014 Form 10-Q (<u>see</u> Am. Compl. ¶¶ 104-06) and full-year 2014 Form 10-K filings (<u>see id.</u> ¶ 123) violated the further disclosure requirements of both Items 303 and 503. (<u>Id.</u> ¶¶ 108, 110, 125.)

As an initial matter, the Second Circuit has held that failures to make the required Item 303 or 503 disclosures on 10-Q or 10-K filings can serve as the basis for a Section 10(b) securities fraud claim. <u>Stratte-McClure v. Morgan Stanley</u>, 776 F.3d 94, 100 (2d Cir. 2015) ("a failure to make a required Item 303 disclosure in a 10-Q filing is indeed an omission that can serve as the basis for a Section 10(b) securities fraud claim"); <u>Indiana Pub. Ret. Sys. v. SAIC, Inc.</u>, 818 F.3d 85, 94 (2d Cir. 2016); <u>see also</u> <u>Panther Partners, Inc. v. Ikanos Commc'ns, Inc.</u>, 538 F. Supp. 2d 662, 669 (2d Cir. 2008) (holding that failure to make a Item 503 disclosure "will generally produce liability under the Securities Act"); <u>Ong v. Chipotle Mexican Grill, Inc.</u>, 294 F. Supp. 3d 199, 235 (S.D.N.Y. 2018).

### a. Item 303 Violation

Item 303 requires that certain SEC-mandated filings
"[d]escribe any known trends or uncertainties that have had or
that the registrant reasonably expects will have a material
favorable or unfavorable impact on net sales or revenues or
income from continuing operations." 17 C.F.R. §
229.303(a)(3)(ii). "[D]isclosure [under Item 303] is necessary
'where a trend, demand, commitment, event or uncertainty is both
[1] presently known to management and [2] reasonably likely to
have material effects on the registrant's financial conditions
or results of operation." Stratte-McClure, 776 F.3d at 101
(quoting Management's Discussion and Analysis of Financial
Condition and Results of Operations, Exchange Act Release No.
6835, 43 SEC Docket 1330, 1989 WL 1092885 at *4 (May 18, 1989)).
However, "such an omission is actionable only if it satisfies
the materiality requirements outlined in [Basic v. Levinson, 485
U.S. 224 (1988)], and if all of the other requirements to
sustain an action under Section 10(b) are fulfilled." Id.; see
also Indiana Public, 818 F.3d at 94. Accordingly, an Item 303
violation will only sustain a claim under Section 10(b) and Rule
10b-5 where a plaintiff has sufficiently pled (1) that the
forward-looking disclosure's omission is material as determined
by "a balancing of both the indicated probability that the event
will occur and the anticipated magnitude of the event in light

of the totality of the company's activity", (2) scienter, (3) a
"connection between the . . . omission and the purchase or sale
of a security," (4) reliance on the omission, and (5) economic
loss caused by that reliance. Stratte-McClure, 776 F.3d at 102-
103 (citations omitted).

Plaintiffs allege that the above quoted statements from
paragraphs 104, 105, and 106 violated Item 303 because they
failed to disclose that the Vodafone Contract could not be
renewed and that this constituted a "material and significant
churn event that would have substantial near-term financial
impact" on Rackspace's 2015 recurring revenues and growth. (Am.
Compl. ¶¶ 110, 124, 125.) Accordingly, Plaintiffs allege
Defendants "failed to disclose [] material events and known
uncertainties that were reasonably likely to have a material
adverse effect on [Rackspace's] results of operations in
violation of" Item 303. (Id.)

Here, however, Plaintiffs have failed to sufficiently
allege that it was "reasonably likely" that the Vodafone Churn
Event would have had a material effect on Rackspace's financial
condition. As the Court has pointed out repeatedly above,
Plaintiffs have failed to plead facts with sufficient
particularity to explain how or why the Vodafone Churn Event
would necessarily have a material, detrimental effect on
Rackspace's financials and operations. For the same reasons,

they have failed to plead that the Vodafone Churn Event was "reasonably likely" to have a material effect on Rackspace's financial conditions or operations with the required particularity. Even if Plaintiffs had met that requirement, Plaintiffs have not made allegations addressing the "anticipated magnitude" of the Vodafone Churn Event in light of the totality of Rackspace's activity. As such, it has failed to adequately plead facts necessary to allege "materiality" under Basic's probability/magnitude test. Stratte-McClure, 776 F.3d at 102-103. Absent such allegations, Plaintiffs have failed to adequately allege an Item 303 violation. Stratte-McClure, 776 F.3d at 101.

### b. Item 503 Violation

Item 503 requires that certain filings "provide under the caption 'Risk Factors' a discussion of the most significant factors that make the offering speculative or risky." In re Lions Gate Entm't Corp. Sec. Litig., 165 F. Supp. 3d 1, 21 (S.D.N.Y. 2016) (quoting 17 C.F.R. § 229.503(c)); see also Panther Partners, 538 F. Supp. 2d at 668-69. The risk factors in this regulation include a company's "lack of an operating history," "lack of profitable operations in recent periods," and "financial position." Lions Gate, 165 F. Supp. 3d at 21 (quoting 17 C.F.R. § 229.503(c)). Courts in this circuit have generally found that Item 503 violations track Rule 10b-5 violations,

meaning courts typically analyze the sufficiency of Item 503 disclosures under the Basic materiality standard. City of Roseville Emps. Ret. Sys. v. EnergySolutions, Inc., 814 F. Supp. 2d 395, 426 (S.D.N.Y. 2011) (collecting cases); see also Lions Gate, 165 F. Supp. 3d at 21.

Here, Plaintiffs contend that the above statements in the 2014 Form 10-Q and full-year 2014 Form 10-K filings violated Item 503 because they failed to disclose that the Vodafone Contract could not be renewed and that this was a "material and significant churn event that would have substantial near-term financial impact" on Rackspace's 2015 recurring revenues and growth. (Am. Compl. ¶¶ 110, 124, 125.) Accordingly, they allege, Defendants "failed to disclose . . . significant, then-existing (as opposed to potential) factors that made the securities more speculative or risky than the Company disclosed in violation of" Item 503. (Id.) Absent from the amended complaint, however are any allegations from which the Court could conclude that the Vodafone Churn Event necessarily put Rackspace's revenue or profits at risk or made the stock more "speculative and risky." Further, for the same reasons stated in the Item 303 analysis above, Plaintiffs have failed to make allegations sufficient to plead Basic materiality. Absent such allegations, the amended complaint does not plausibly allege an Item 503 violation. Lions Gate, 165 F. Supp. 3d at 21.

### 6. Additional Arguments

As the Court has found that Plaintiffs have failed to state a claim for a Section 10(b) violation on the above grounds, it does not need to address Defendants' additional arguments for dismissal.

### B. Violation of § 20(a) of the Exchange Act

The amended complaint includes claims for alleged violations of Section 20(a) as to Defendants Pichler and Rhodes. A claim for control person liability is "necessarily predicated on a primary violation of securities law." Rombach, 355 F.3d at 177-78; SEC v. First Jersey Secs., Inc., 101 F.3d 1450, 1472-73 (2d Cir. 1996). As the Court has held that Plaintiffs have failed to plead a violation of securities law, Defendants' request to dismiss this claim is granted. Supercom, 2018 WL 4926442, at *33.

### IV. Leave to Amend

Rule 15 of the Federal Rules of Civil Procedure instructs courts to "freely give leave" to amend "when justice so requires." Fed. R. Civ. P. 15(a)(2). Amendment is not warranted, however, "absent some indication as to what [a plaintiff] might add to [its] complaint in order to make it viable." Shemian v. Research In Motion Ltd., 570 F. App'x 32, 37 (2d Cir. 2014) (quoting Horoshko v. Citibank, N.A., 373 F.3d 248, 249 (2d Cir. 2004)).

Accordingly, should Plaintiffs wish to amend their complaint, they must demonstrate (1) how they will cure the deficiencies in its claims by filing a proposed amended complaint and (2) that justice requires granting leave to amend. Such demonstration shall be filed within 30 days of the date of this Opinion.

## Conclusion

For the reasons stated above, Defendants' motion to dismiss Plaintiff's complaint is GRANTED.

The Clerk of Court is respectfully directed to terminate the motion docketed at ECF No. 37.

**SO ORDERED.**

Dated:     New York, New York
           February 5, 2019

John F. Keenan
United States District Judge